THIRD DIVISION

June 30, 1997

No. 1-95-4377

ESTATE OF BARBARA PARKS, )

)

Plaintiff-Appellant, )

) Appeal from the Circuit

v. ) Court of Cook County.

)

RICHARD O'YOUNG, M.D., )

)

Defendant-Appellee, )

) HONORABLE MICHAEL J.

and ) KELLY, JUDGE PRESIDING.

)

ST. BERNARD HOSPITAL, )

)

Defendant. )

JUSTICE GORDON delivered the opinion of the court:

Barbara Parks, a former nurse at St. Bernard Hospital, filed a four-count complaint against defendants St. Bernard Hospital and Richard O'Young, M.D.  Counts I and II, directed against the hospital, alleged defamation and retaliatory discharge; and counts III and IV, directed against O'Young, alleged defamation and tortious interference with contract.  Prior to trial, the counts against St. Bernard Hospital were dismissed pursuant to a settlement agreement.  At trial, the court directed a verdict in favor of O'Young on the tortious interference count; and the jury returned a verdict in favor of O'Young on the defamation count.  The plaintiff appeals.

Parks' estate, which was substituted as the appellant upon Parks' death, argues that the trial court erred in granting three of defendant's motions 
in
 
limine
 which barred plaintiff from presenting certain evidence and that the trial court erred in granting the directed verdict on plaintiff's tortious interference count.
(footnote: 1)[fn1]

Plaintiff's tortious interference count against Doctor O'Young alleged that on July 29, 1991 she was a recovery room nurse and he was a staff physician at St. Bernard Hospital.  She alleged that, on that date, she observed O'Young violently shake the neck of a nine-year-old patient; verbally abuse that patient by making racially charged remarks about that patient; and mistreat the patient by inappropriately pulling on the traction apparatus to which the patient's leg was connected.  The plaintiff further alleged that she prepared an occurrence report regarding that incident and gave the report to her supervisor.  The plaintiff alleged that O'Young intentionally and with malice interfered with her employment and caused her termination with the hospital by making a false accusation that she had divulged confidential information about the incident to the patient's family.

I.  Motions 
in
 
Limine

Prior to trial, O'Young filed several motions 
in
 
limine
.  The motions which are the subject of the instant appeal sought to exclude the following:  evidence "relating to the specific nature or factual particulars of an alleged incident or occurrence which took place between Dr. O'Young and a minor patient *** on July 29, 1991"; evidence of purported misconduct by O'Young toward other patients; and evidence of a telephone conversation, which the plaintiff claimed to have overheard, between Reggie Williamson, a hospital employee, and a person thought by Parks to be O'Young.

The plaintiff argues that the trial court erroneously excluded evidence regarding O'Young's mistreatment of the patient on July 29, 1991 as well as his mistreatment of "other black children."  The plaintiff argues that testimony from other witnesses who observed O'Young's treatment of the patient on July 29, 1991 as well as his treatment of "other black children" was probative of her credibility.  She also argues that evidence regarding the July 29, 1991 incident was highly probative of O'Young's motivation to cause her discharge and would have shown that he was angered by her filing an incident report against him and that he feared possible discipline against himself.  

The admission of evidence is within the sound discretion of the trial court, and a reviewing court will not reverse the trial court unless that discretion is abused.  
Gill v. Foster
, 157 Ill. 2d 304, 626 N.E.2d 190 (1993).  Evidence, though relevant, may be excluded if its probative value is substantially outweighed by such factors as prejudice, confusion, or potential to mislead the jury.  
Gill
, 157 Ill. 2d 304, 626 N.E.2d 190; 
Patch v. Glover
, 248 Ill. App. 3d 562, 618 N.E.2d 583 (1993).  It is within the trial court's discretion to balance the probative value of evidence against its prejudicial impact or tendency to create confusion and to decide whether the evidence should be admitted.  
Dominguez v. St. John's Hospital
, 260 Ill. App. 3d 591, 632 N.E.2d 16 (1993).

The trial court's exclusion of evidence regarding O'Young's alleged treatment of the patient on July 29, 1991 as well as his alleged treatment of "other black patients" was not an abuse of discretion.  That evidence would have been highly inflammatory in that it suggested that O'Young was abusive toward child patients and that he was racially prejudiced against black patients.  That prejudicial impact far outweighed any marginal relevance that the evidence had in terms of explaining the reason for Parks' submission of an occurrence report against O'Young and in terms of suggesting a motive for O'Young's alleged actions against Parks.  Moreover, even without the excluded testimony, the plaintiff was able to establish motive for O'Young's alleged defamation and interference with contract based upon admitted evidence showing that Parks filed an incident report on July 29, 1991 against O'Young in which she accused him of misconduct.  Thus, there would be no material need to disclose the details of the alleged misconduct contained in the incident report to establish a retaliatory motive.

The plaintiff next contends that the trial court improperly granted O'Young's motion 
in
 
limine
 to exclude the contents of a telephone conversation overheard by Parks between Williamson and another individual, whom Parks thought to be O'Young, in which Parks heard Williamson state "Doctor O'Young, Parks told the family?"  The trial court initially excluded Parks' testimony concerning the content of that telephone conversation on the basis that it was hearsay.  After further consideration, the court reaffirmed its prior ruling to exclude the testimony not on the basis of hearsay but because it was vague, equivocal, and imprecise.

Hearsay evidence is testimony in court regarding a statement made out of court offered for the truth of the matter asserted.  It rests upon the credibility of the out-of-court asserter.  
Lundberg v. Church Farm, Inc.
, 151 Ill. App. 3d 452, 502 N.E.2d 806 (1986).  See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.1 at 632 (6th ed. 1994) (hereinafter referred to as M. Graham, Illinois Evidence).  The phrase "matters asserted" in the definition of hearsay includes "statements" that occur in question form if the declarant implicitly intended to express the inference for which the statement is offered.  See generally, M. Graham, Illinois Evidence §801.1, at 635-36.  
Cf
. 
People v. Camp
, 128 Ill. App. 3d 223, 470 N.E.2d 540 (1984) (holding that question "are you all right to drive the car" does not presuppose inability to drive as an implicit fact that must be true).  Arguably, Williamson's statement was intended to express or repeat in question form the narrative statement apparently made by the other party on the telephone line (ostensibly O'Young).  That statement implicitly asserts that the person conversing with Williamson was O'Young and that O'Young told Williamson that Parks "told the family."  While O'Young's statement if directly overheard would have been admissible as an admission of a party opponent, Williamson's implied statements concerning what he heard on the telephone from O'Young would be barred as hearsay since it was being offered for the truth of the matter asserted.

The plaintiff alternatively argues, that even if hearsay, Parks' testimony concerning Williamson's telephone conversation should have been admitted under the present sense impression exception to the hearsay rule.  The plaintiff cites to 
United States v. Blakey
, 607 F.2d 779, 784 (7th Cir. 1979) which defines a present sense impression as "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."  The plaintiff argues that Parks' testimony would describe what she saw and heard Williamson say.  We disagree.

First we note that, although the present sense impression rule is a hearsay exception recognized under the Federal Rules of Evidence (see Fed. R. Evid. 803(1)), we are aware of no Illinois cases that have applied that exception.  See 2 R. Hunter, Trial Handbook for Illinois Lawyers §70.28, at 322-23 (7th ed. 1996) (stating that Illinois has adopted spontaneous declaration exception not present sense impression exception).  Moreover, even if such an exception existed under Illinois law, it would not be applicable to the instant case.

The present sense impression exception has three requirements:  (1) that the statement describe or explain the event perceived; (2) that the declarant must have in fact perceived the event described; and (3) that the description must be substantially contemporaneous with the event in question.  
United States v. Mejia-Velez
, 855 F. Supp. 607, 613-14 (E.D. N.Y. 1994); 
Miller v. Crown Amusements, Inc.
, 821 F. Supp. 703 (S.D. Ga. 1993).  See 
Booth v. State
, 306 Md. 313, 508 A.2d 976 (1986) for historical analysis of present sense impression exception.  The present sense impression exception allows the admission of a declarant's report made to a third party concerning observations that the declarant is making at a time contemporaneous with those observations.  See, 
e.g.
, 
United States v. Hawkins
, 59 F.3d 723, 730 (8th Cir. 1995) (tape recording of "911" telephone call); 
Blakey
, 607 F.2d 779 (tape recording of statements made by individual who witnessed extortion); 
United States v. Cain
, 587 F.2d 678, 681 (5th Cir. 1979) (state trooper's testimony concerning CB radio transmission made by a witness to an occurrence); 
Mejia-Velez
, 855 F. Supp. 607 (tape recordings of "911" telephone calls made contemporaneously by eyewitnesses to shooting).  The reliability of the statement is derived from the fact that the statement is safe from any error caused by a defect in the declarant's memory and from the fact that there is little or no time for the declarant to calculate misstatement.  Also, the statement will usually be made to a third person (who subsequently testifies to it) who, being present at the time and scene of the observation, will probably have an opportunity to observe the situation himself and be able to corroborate the declarant's statement.  See generally, 2 J. Strong, McCormick on Evidence §271, at 212 (4th ed. 1992).

Here, Williamson, the declarant, was not reporting to or discussing with Parks his observations of an event that was occurring contemporaneously with his remarks.  Williamson's statement, which Parks overheard, did not explain, characterize or elucidate in any way a physical occurrence that he was observing.  See 
Miller
, 821 F. Supp. 703 (for present sense impression exception to apply, declarant must have seen the event).  See generally, J. Strong, McCormick on Evidence §271, at 213 (4th ed. 1992) ("present sense impressions are limited to 'describing or explaining' the event or condition perceived").  Williamson was merely engaged in a telephone conversation in which he was listening to and questioning the person with whom he was conversing.  To permit the present sense impression exception to apply to overheard conversations, such as in the instant case, would in effect permit this exception to substantially devour the entire hearsay rule of exclusion.

The plaintiff also argues that Parks' testimony concerning Williamson's telephone conversation was not hearsay because it was not offered to prove the matter asserted but only to prove that Williamson made the statement.  We strongly disagree.  The only relevance of Parks' testimony was to establish the truth of the matter that O'Young made an accusation to Williamson that Parks divulged information to the patient's family.  Absent that purpose, Parks' testimony had no tendency to make the existence of any consequential fact more probable.  If Williamson's statement could not be offered for the truth of the matter asserted, it served no other purpose than to establish that Williamson was engaged in a telephone conversation at the nurses station, a fact of no relevance to the matter in controversy.  Moreover, aside from its hearsay infirmity, Parks' testimony was speculative in so far as establishing the identity of the other party to the telephone conversation.  Parks testified during her deposition that she heard O'Young page Williamson and that shortly thereafter she overheard Williamson talking on the telephone at the nursing station.  No other evidence was offered to establish the identity of the other party.  Consequently, the court did not abuse its discretion in excluding that conversation since the inference as to the identity of that party was too remote and conjectural.  See 
In re Elias
, 114 Ill. 2d 321, 499 N.E.2d 1327 (1986) (evidence is relevant where it is material and probative); 
Butler v. Kent
, 275 Ill. App. 3d 217, 655 N.E.2d 1120 (1995) (court may reject evidence that is not helpful in proving a matter in controversy because the inference to be drawn is too vague or conjectural); 
People v. Ward
, 19 Ill. App. 3d 833, 313 N.E.2d 314 (1974).  

In related argument, the plaintiff argues that the trial court's ruling with respect to the Williamson conversation was inconsistent with the court's ruling allowing Margaret Gleason, the Vice President of Nursing at St. Bernard Hospital, to testify concerning a conversation she had with Williamson.  In that regard, Nurse Gleason testified that Williamson told her that the patient's mother told him that a nurse in the room had asked the patient to tell the mother about an incident that had occurred earlier in the day.  The trial court overruled plaintiff's hearsay objection to Gleason's testimony finding that the testimony was not hearsay because it was not being offered for the truth of the matter asserted but to show that the hospital terminated Parks based on information gathered from sources other than O'Young.

The trial court's admission of Gleason's testimony was correct and not inconsistent with its prior ruling prohibiting Parks' testimony regarding Williamson's telephone conversation. Extra-judicial statements are admissible to show that the recipient of the statement was placed on notice or had knowledge of a certain fact.  See 
People v. Camp
, 128 Ill. App. 3d 223, 470 N.E.2d 540 (1984).  See generally, M. Graham, Illinois Evidence §801.5, at 647 (a statement is not hearsay when the fact that the statement is made is relevant for its effect on the listener without regard to the truth of the matter asserted).  Gleason's testimony was not hearsay because it was not offered for the truth of the matter asserted but to show the source of the hospital's knowledge concerning Parks' misconduct that resulted in her termination.  As will be discussed in greater detail below, Gleason testified that the hospital terminated Parks because she divulged confidential hospital information to the patient's family.  She testified that one of the sources of information to support the hospital's findings with respect to Parks came from Williamson's report of his discussion with the patient's family.  Thus, Gleason's testimony concerning her conversation with Williamson was not being offered for the categorical truth of the matter asserted by Williamson in that conversation, namely, that Parks had divulged confidential information to the patient's family.  Rather, it was offered to show that Williamson was the source for the information provided to the hospital upon which the hospital relied in its decision to terminate Parks since, unlike a court, a hospital, like any other private entity, is free to conduct its business in reliance upon hearsay sources of information.  In contrast, as stated above, Parks' testimony regarding Williamson's out-of-court telephone statement was being offered to the court for the truth of the matter, that O'Young told Williamson that Parks had spoken to the patient's family.

II.  Directed Verdict

The plaintiff next argues that the trial court erred in directing a verdict during plaintiff's case-in-chief on plaintiff's tortious interference count.

Verdicts are to be directed only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand.  
E.g.
, 
Maple v. Gustafson
, 151 Ill. 2d 445, 603 N.E.2d 508 (1992); 
Mizowek v. De Franco
, 64 Ill. 2d 303, 356 N.E.2d 32 (1976); 
Pedrick v. Peoria & Eastern R.R.
, 37 Ill. 2d 494, 229 N.E.2d 504 (1967).  In ruling on a directed verdict, the court cannot weigh the evidence nor determine the credibility of the witnesses.  It may only consider the evidence in the light most favorable to the party resisting the motion.  
Maple
, 151 Ill. 2d 445, 603 N.E.2d 508.

In order to recover on the theory of tortious interference with contract, a plaintiff must show:  the existence of a valid and enforceable contract between the plaintiff and another; defendant's awareness of this contractual relation; defendant's intentional and unjustified inducement of a breach of the contract; the subsequent breach by the other caused by defendant's wrongful conduct; and damages.  
HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.
, 131 Ill. 2d 145, 545 N.E.2d 672 (1989); 
Reuben H. Donnelley Corp. v. Brauer
, 275 Ill. App. 3d 300, 655 N.E.2d 1162 (1995).  At trial, the defendant argued that he was entitled to a directed verdict because the plaintiff failed to present any evidence to support a finding that he induced the hospital's decision to terminate Parks or that the hospital's termination of Parks was caused by his conduct.

On appeal, the plaintiff argues that the directed verdict should not have been granted because the evidence adduced at trial created an inference that O'Young could have caused Parks' termination because he informed the hospital that Parks revealed confidential hospital information about O'Young's treatment of a patient.  The plaintiff contends that the evidence also showed that O'Young was motivated to cause Parks' discharge because she had filed an incident report against him.

At trial, O'Young testified as an adverse witness.  He testified that on July 29, 1991 Parks filed an incident report against him.  He stated that after he heard that Parks had filed the report, he went to the supervisor of the operating room, Jerilyn Barly, to confirm that a report had been filed and to discover the contents of the report.  Barly confirmed that Parks had filed the report.  O'Young testified that later that day he went to the room of the patient who was the subject of Parks' incident report to check the traction on the patient.  O'Young stated that the patient's father was "mad" and wanted to change doctors because a nurse had told him about the incident report.  O'Young told that father that he did not do what was alleged.  O'Young then paged Reggie Williamson, the night nurse supervisor, to arrange for a doctor change.  O'Young stated that he told Williamson that the father wanted to change doctors because he was angry about an incident that had been relayed to him by a nurse.  O'Young stated that, when he talked to Williamson, he did not know the identity of the nurse who had talked to the patient's father.  He stated that he did not discuss the incident report with Williamson; he relayed to Williamson what the patient's father told him.

O'Young testified that after Williamson met with the patient and the patient's family, he and Williamson discussed the matter with Margaret Gleason.  According to O'Young, the primary purpose of their discussion was the care of patient and the second purpose was to discover why the father of the patient was upset.  O'Young testified "I think they want [
sic
] to find out who the nurse involved is, since I did not know who the nurse involved was."  When asked whether the suspicion was that Parks was the nurse involved, O'Young responded, "I think that was their conclusion.  I did not make that conclusion."  O'Young stated that some discussion also occurred on the issue of whether there had been a breach of the standard procedure for reporting occurrences in the operating room.

On cross-examination by his attorney, O'Young testified that no change in doctors occurred with respect to the patient and that he continued to serve as the patient's physician through the patient's discharge and follow-up care.  O'Young stated that he never accused Barbara Parks of divulging confidential patient information.  O'Young did not think Parks was the nurse involved because the patient's father said he had spoken to a recovery room nurse and Parks did not work in that capacity.  O'Young testified that, as a staff physician, he had no authority to hire or fire nurses; that he did not make a recommendation to anyone at St. Bernard Hospital that Parks be suspended or fired; and that he did not participate in any discussions with hospital administrative personnel regarding their making of a decision to fire or suspend Parks.

Barbara Parks testified that after the incident involving O'Young and the patient, she called her supervisor, Jerilyn Barly, and was instructed to fill out an incident report.  She stated that later in the day she visited the patient but refused to discuss the incident with the patient's mother except to say that she "wrote it."  Parks testified that when she returned to work on July 30, 1991, Barly requested that she go to the nursing office.  Margaret Gleason and Ronald Campbell, Gleason's assistant, were in the office.  At that meeting, Parks denied talking to the patient's mother on July 29.  Parks was given a three-day suspension and went home.  She returned to the hospital the following Monday at which time she met with Campbell and Barly.  Campbell informed her that they had conducted an investigation of the July 29 incident and determined that Parks should be terminated.

On cross-examination, Parks admitted that O'Young's signature was not on the suspension notice and that O'Young was not present when she received that document or the termination document.  Barly and Gleason signed the suspension notice; and Barly and Campbell signed the termination notice.  Parks admitted that she had no firsthand knowledge that O'Young participated in the hospital's decision to suspend her.  She admitted that she had no knowledge that anyone at the hospital talked to O'Young about whether the hospital should suspend her.  She stated that she was told she was being terminated based upon the hospital's investigation of an incident that occurred on July 29, 1991.  She stated that the hospital told her that that they had concluded that she had divulged confidential patient information to the patient's family.

Margaret Gleason testified that on the morning of July 29, 1991 Parks told her about the incident involving O'Young and a patient.  Gleason visited the patient the next day; and later that day, talked to the patient's mother who had filed a complaint on the evening of July 29.

When questioned as a defense witness, Gleason stated that on July 29, 1991, at 5:00 p.m., Reggie Williamson, the house coordinator, informed her that the mother of the patient had made a complaint.  Pursuant to Gleason's request, Williamson visited the mother and made a report.  He told Gleason that a nurse in the patient's room had asked the patient to tell his mother what had happened earlier in the day.  Gleason stated that on July 30, 1991, she met with Barly and Campbell to discuss the incident and how it should be handled.  Based upon the information supplied by Williamson, Gleason decided to suspend Parks for three days for violating hospital confidentiality procedures.  Gleason stated that when she met with Parks, Parks admitted that she told the patient to tell his mother about the incident.  Gleason further stated that later that day she met with the patient's mother and the mother reiterated that the nurse told her son to tell her about the incident.  According to Gleason, the decision to terminate Parks was made by Janet Nohos and Doctor Carst.  Gleason stated that O'Young did not participate in any meeting or discussion concerning Parks' suspension or termination and did not have any role or input in the hiring or firing of nurses.  The decision to fire Parks was based solely on information supplied by Williamson and Parks.

After Gleason's testimony, the defense moved for directed verdict and was granted a directed verdict on the tortious interference count of plaintiff's complaint.
(footnote: 2)[fn2]  As discussed above, Parks argues that the directed verdict should not have been granted because a reasonable inference could have been drawn from O'Young's testimony that he caused Parks' termination.  In this regard the plaintiff argues that, based upon O'Young's testimony, one could infer that O'Young told the hospital administrators that Parks had disclosed confidential information to the patient's family; that his disclosure was the cause of her termination; and that he was motivated to seek Parks' termination because she had filed an incident report against him.  These contentions are, however, unsupported by the record.

The evidence viewed in a light most favorable to the plaintiff shows an absence of evidence establishing that O'Young made accusatory statements against Parks or that O'Young caused the hospital to terminate her.  The evidence at trial showed merely that O'Young discussed with Jerilyn Barly the existence of the incident report filed by Parks.  The evidence also showed that O'Young discussed the care of the patient who was the subject of the incident report with Williamson, Gleason, and the patient's father.  No admissible testimony was elicited to show that, during any of those discussions, O'Young accused Parks of divulging confidential patient information.

Evidence that O'Young did not participate in the hospital's decision to terminate Parks was uncontroverted.  O'Young testified that he did not make a recommendation to anyone at the hospital that Parks be suspended or terminated and that he did not participate in any discussions with hospital administrative personnel regarding the decision to suspend or fire Parks.  Parks testified that she had no firsthand knowledge that O'Young participated in the hospital decision to suspend her.  She admitted she had no knowledge that anyone at the hospital had talked to O'Young about whether the hospital should suspend her.  She stated that she was told that the hospital's decision to terminate her was based upon its investigation of the incident that occurred on July 29, 1991 and its conclusion that she had divulged confidential patient information to the patient's family.  Margaret Gleason, the vice president of nursing, stated that the decision to terminate Parks was based solely upon information supplied by Williamson and Parks.  Gleason also testified that O'Young did not participate in any meeting or any discussion concerning Parks' suspension or termination.  Finally, none of the documents relating to Parks' suspension and termination contained or mentioned O'Young's name.

Despite the existence of evidence that could suggest that O'Young had a motive to seek Parks' termination, that evidence without more could not withstand the directed verdict motion.  Given the lack of evidence establishing that O'Young accused Parks of disclosing confidential information and given the uncontroverted testimony that O'Young did not participate in discussions or have any decision-making authority with respect to Parks' employment status, no reasonable inference can be made that O'Young caused Parks' termination solely because he had a motive to do so.

In related argument, the plaintiff argues that the court should not have granted a directed verdict on the tortious interference count because it did not grant a directed verdict on the defamation count.  According to the plaintiff, a tortious interference claim requires "a showing of less specific behavior by the defendant" than does the defamation claim such that the court should not have directed a verdict on the former if it did not also do so on the latter.

The elements necessary to establish tortious interference with contract have been set forth above and will not be repeated here.  Defamation 
per
 
se
, as the plaintiff notes, can be established by proof of words that prejudice a person in his profession or trade.  See 
Mittelman v. Witous
, 171 Ill. App. 3d 691, 525 N.E.2d 922 (1988), 
aff'd
, 135 Ill. 2d 220, 552 N.E.2d 973 (1989).  In the proper case, defamatory words also may support a tortious interference with contract claim, if those words cause the breach of contract.  Here, in denying the motion for directed verdict on the defamation count, the trial court gave no reason for its decision.  To the extent the defamation action was based upon words uttered by O'Young that Parks had divulged confidential patient information, there may be an inconsistency in the court's rulings with respect to the defamation and tortious interference with contract actions.  However, that inconsistency would, if anything, raise questions concerning the correctness of the court's ruling with respect to the defamation count rather than vitiate its ruling on the tortious interference count.  Any error regarding its ruling on the defamation count would in any event be harmless since the defamation count was adjudicated against the plaintiff by the jury.  Moreover, notwithstanding the possibility of an underlying inconsistency, it is possible to reconcile the court's rulings because, even if O'Young may have spoken defamatory words accusing Parks of divulging confidential patient information, as discussed above, there was no evidence to suggest that any such utterance impacted the hospital's decision to terminate Parks and caused it to breach her employment contract.

   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

COUSINS, Jr. P.J. and CAHILL, J., concur.

[fn1]Plaintiff's notice of appeal purported to appeal from both the directed verdict on the tortious interference count and the jury verdict on the defamation count.  In a motion taken with the case, O'Young moved to dismiss plaintiff's appeal from the jury verdict on the defamation count because the plaintiff had not filed a post-trial motion.  Supreme Court Rule 366(b)(2) (155 Ill. 2d R. 366(b)(2)) (limiting scope of review in civil jury cases to points, grounds and relief specified in the post-trial motion); see 
Leslie H. Allott Plumbing & Heating, Inc. v. Owens-Corning Fiberglas
, 112 Ill. App. 3d 136, 444 N.E.2d 1390 (1983) (party's failure to file a post-trial motion results in the waiver of any issue not so raised).  Defendant's motion has been rendered moot because the appellant's brief, filed after that motion, fails to argue any error with respect to the verdict on the defamation count.

[fn2]The record shows that the plaintiff called another witness after the motion for directed verdict was granted.  In its reply brief, the plaintiff argues for the first time that the directed verdict should be reversed because it was granted prematurely and before the close of the plaintiff's case.  In a motion taken with the case, the defendant moved to strike this argument.  Defendant is correct that points not argued in the appellant's brief are waived and cannot be raised for the first time in the reply brief.  155 Ill. 2d R. 343(e)(7) ("[p]oints not argued are waived and shall not be raised in the reply brief"); 
Miller v. Miller
, 268 Ill. App. 3d 132, 643 N.E.2d 288 (1994).  Moreover, even if not waived on this basis, the error if any was waived at trial by plaintiff's failure to raise the timeliness issue at trial.  Plaintiff only argued the substantive merits of the motion.  Finally, even if error occurred, it would not require reversal because Barly's subsequent testimony did not supply evidence that would support the denial of the directed verdict motion.  Barly testified that Parks spoke to her on the morning of July 29, 1991 about an alleged incident between O'Young and a patient.  She testified that she told Parks to fill out an incident report and that Parks gave her a copy of the report.  Barly testified that she was present when the suspension notice was given to Parks.  She further testified that she was not involved in the decisions to suspend and terminate Parks.  None of this testimony supports plaintiff's theory that O'Young caused Parks' termination and, thus, would not have prevented the court's grant of defendant's motion for directed verdict on the tortious interference count of plaintiff's complaint.

FOOTNOTES
1:
Plaintiff's notice of appeal purported to appeal from both the directed verdict on the tortious interference count and the jury verdict on the defamation count.  In a motion taken with the case, O'Young moved to dismiss plaintiff's appeal from the jury verdict on the defamation count because the plaintiff had not filed a post-trial motion.  Supreme Court Rule 366(b)(2) (155 Ill. 2d R. 366(b)(2)) (limiting scope of review in civil jury cases to points, grounds and relief specified in the post-trial motion); see 
Leslie H. Allott Plumbing & Heating, Inc. v. Owens-Corning Fiberglas
, 112 Ill. App. 3d 136, 444 N.E.2d 1390 (1983) (party's failure to file a post-trial motion results in the waiver of any issue not so raised).  Defendant's motion has been rendered moot because the appellant's brief, filed after that motion, fails to argue any error with respect to the verdict on the defamation count.

2:
The record shows that the plaintiff called another witness after the motion for directed verdict was granted.  In its reply brief, the plaintiff argues for the first time that the directed verdict should be reversed because it was granted prematurely and before the close of the plaintiff's case.  In a motion taken with the case, the defendant moved to strike this argument.  Defendant is correct that points not argued in the appellant's brief are waived and cannot be raised for the first time in the reply brief.  155 Ill. 2d R. 343(e)(7) ("[p]oints not argued are waived and shall not be raised in the reply brief"); 
Miller v. Miller
, 268 Ill. App. 3d 132, 643 N.E.2d 288 (1994).  Moreover, even if not waived on this basis, the error if any was waived at trial by plaintiff's failure to raise the timeliness issue at trial.  Plaintiff only argued the substantive merits of the motion.  Finally, even if error occurred, it would not require reversal because Barly's subsequent testimony did not supply evidence that would support the denial of the directed verdict motion.  Barly testified that Parks spoke to her on the morning of July 29, 1991 about an alleged incident between O'Young and a patient.  She testified that she told Parks to fill out an incident report and that Parks gave her a copy of the report.  Barly testified that she was present when the suspension notice was given to Parks.  She further testified that she was not involved in the decisions to suspend and terminate Parks.  None of this testimony supports plaintiff's theory that O'Young caused Parks' termination and, thus, would not have prevented the court's grant of defendant's motion for directed verdict on the tortious interference count of plaintiff's complaint.