FIFTH DIVISION

                                                December 30, 1999                                                    

No. 1-97-0213 

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

RICHARD STACK, 

Defendant-Appellant.

)

)

)

)

)

) )

)

)

)

)

Appeal from the Circuit Court of Cook County

Honorable 

Themis Karnezis 

Judge Presiding.

JUSTICE QUINN delivered the opinion of the court: 

Following a bench trial in the circuit court of Cook County, defendant, Richard Stack, was convicted of the May 11, 1980, murder of his wife and 13-month-old son and then sentenced to concurrent terms of life imprisonment.  This was defendant's third trial.  Previously, this court reversed defendant's first conviction on 
several grounds and remanded for a new trial.  
People v. Stack
, 128 Ill. App. 3d 611 (1984) (opinion of Buckley, J., Campbell, J.,  dissenting) (
Stack I
).  The State appealed the appellate panel's decision, and the Illinois Supreme Court affirmed this court's opinion in part and remanded for a new trial.  
People v. Stack
, 112 Ill. 2d 301 (1986) (
Stack II
).  A second jury trial resulted in another conviction.  Defendant appealed his second conviction, and this court again reversed and remanded.  
People v. Stack
, 244 Ill. App. 3d 166 (1993) (opinion of Buckley, J., Campbell, J., specially concurring) (
Stack III
).

Defendant filed a timely appeal from his third conviction and sentence and contends that the trial court erred in the following: (1) by allowing testimony concerning his post-
Miranda
 silence in violation of both his state and federal due process rights; (2) by finding that the State proved defendant sane beyond a reasonable doubt; (3) by improperly limiting the testimony of Laura Doise; (4) by improperly denying defendant's motion to take an evidentiary deposition of two witnesses; (5) by restricting the testimony of defendant's psychiatric experts; (6) by not allowing defendant's treating physician, Dr. Jane Caseley, to testify as to her opinion of his mental condition shortly after the murders; (7) by not allowing Detective Foley to testify as to a prior consistent statement by Father Lutz; and (8) by limiting defense counsel's questioning of the prosecution's expert witness.  For the reasons set forth below, we affirm defendant's conviction and sentence.

The evidence elicited at defendant's third trial was substantially similar to that presented in both of his prior trials.  Therefore, in the interest of brevity, we adopt, with the exceptions discussed below, the recitation of facts from 
Stack I
 and 
Stack III
.  

Officer William Christopher testified that, along with Officer Thomas Scott, he arrived at defendant's residence on May 11, 1980, at 2:50 p.m. and saw defendant leaning out of a broken window and yelling.  As part of his testimony describing the scene at defendant's residence, Officer Christopher acknowledged that he made a number of requests or commands to defendant. Officer Christopher testified that defendant had no difficulty with the requests or commands.  

Officer Thomas Scott testified, as he had at the two previous trials, that as he approached defendant's residence on May 11, 1980, defendant was leaning out of a window, naked to the waist, yelling "something about devils." Scott testified that sub-

sequently he was with defendant in the emergency room of Holy Cross Hospital.  Whenever a nurse or doctor would walk in, defendant would immediately start talking about demons and devils.  Defendant said nothing about devils and demons when he and Scott were alone.  On cross-examination, defense counsel asked Officer Scott whether defendant said anything when the two were alone at the crime scene.  Officer Scott stated that defendant was silent.

Former priest Robert Spielman, an associate pastor to Father Robert Lutz in 1980, testified for the State.  Although he had not testified at either of the two previous trials, Spielman stated that he had witnessed a conversation between Father Lutz and defendant during the early morning hours of May 9, 1980, at the rectory of St. Mary Star of the Sea.  According to Spielman, he remained behind a glass partition while Father Lutz answered the door.  Spielman testified that he did not recall hearing all of the conversation between Father Lutz and defendant, but did remember that Father Lutz said that defendant appeared to be intoxicated and had complained about his troubled marriage.  However, he did not remember Father Lutz saying anything about defendant's concerns re-

garding evil in the world.

Dr. Henry Lihmeyer testified as an expert in the field of psychiatry for the State.  Dr. Lihmeyer interviewed defendant on April 25, 1996.  Prior to the interview, Dr. Lihmeyer reviewed the grand jury testimony, the testimony from the two previous trials, the testimony from defendant's prior fitness hearings, psychological and psychiatric reports, and medical reports.  He conducted interviews with the family and friends of both defendant and his wife Carol, and referred defendant to Dr. Linda Grossman for psychological testing.  Based on his review and analysis of the above information, Dr. Lihmeyer was of the opinion that defendant was sane on May 11, 1980, and was able to appreciate the criminality of his act.

According to Dr. Lihmeyer, defendant told him that he had been violent towards Carol during their marriage and that he often hit and beat her.  Defendant also told Dr. Lihmeyer that whenever he was under the influence of alcohol or drugs, he would become more abusive, both verbally and physically.  Dr. Lihmeyer testified that he believed  that the version of the events of May 11, 1980, that defendant related to him differed from prior accounts.  In other versions of the murders defendant had insisted the devil was in Carol, but defendant never told Dr. Lihmeyer that he killed Carol because he saw the devil in her.  Dr. Lihmeyer noted that defendant had admitted to drinking and using drugs, including PCP and cocaine, in the days before May 11, 1980.  Dr. Lihmeyer testified that if defendant used drugs up until the week before the murders, he may have had some psychotic symptoms during that week that would still have allowed him to function normally.  Defendant told Dr. Lihmeyer that he had significant financial problems at the time of the murders.  Carol was pressuring him to get a job and his in-laws were pressuring him to get a job and pay back some of the money he had borrowed.

Dr. Lihmeyer disagreed with the medical professionals who reported that defendant suffered from paranoid schizophrenia, and he testified that defendant was sane at the time of the murders, basing his opinion on the following beliefs: (1) defendant's varying accounts of the murder were inconsistent with an individual suffering from a serious mental disease; (2) because defendant's delusions changed, Dr. Lihmeyer did not believe they were truthful; (3) defendant's calm and cooperative behavior at the time of his arrest was inconsistent with that of someone who had just experienced a psychotic episode; and (4) defendant's behavior at Holy Cross Hospital following the murders differed depending on who was in the room.  Instead, Dr. Lihmeyer believed that defendant suffered from a conduct disorder evidenced by events in his childhood, including alcohol abuse beginning at a young age, poor school performance, prior treatment for attention deficit disorder, and aggression.  

Dr. Lihmeyer also noted the significance of defendant not having a history of mental illness and no member of his family having a record of mental illness.  There is a definite correlation between schizophrenia and heredity but a low correlation between antisocial personality disorder and heredity.  Dr. Lihmeyer testified that defendant's records from Chester Mental Health Center indicated that in December 1980 the Chester treatment team felt that defendant was fit for trial and he exhibited no psychotic symptoms.  Yet when Dr. Stipes came to examine defendant in Chester on December 15, 1980, defendant began to act unusual.  By January 1981, the Chester team thought defendant was taking a psychology and the law course and defendant was orchestrating an insanity defense.       

Defense counsel disputed Dr. Lihmeyer's credibility and argued to the trial court that he was biased.  Dr. Sheldon Miller of Northwestern University Medical School testified that, contrary to Lihmeyer's resume, he was no longer a professor, having resigned in 1994.  However, the trial court refused to let defense counsel question Dr. Miller as to Dr. Lihmeyer's reason for leaving his professorship.

Anthony Grau testified for the State.  According to Grau, he had known defendant for several years prior to 1980 and sold drugs to him for 2½ years before the murders.  He saw defendant under the influence of drugs and alcohol on numerous occasions and stated that defendant was often violent, aggressive and outspoken.  While in custody on a murder charge of his own, Grau attempted suicide and was sent to Cermak Hospital.  There, he saw defendant.  Grau testified that while in custody together defendant never said anything about demons, devils or God.  In fact, defendant and Grau talked about "acting crazy" and defendant told Grau that he was going to use the Bible to prove that he was crazy.  Defendant and Grau observed other inmates who were mentally ill and learned how to act and what to say.  They discussed how they needed to persuade the doctors at the Psychiatric Institute that they were unfit for trial.  They would then be transferred to Chester, where they would build a psychiatric history.  Their ultimate goal was to be found not guilty by reason of insanity.

When questioned about his motivation for testifying, Grau explained that he had 37 months left on his 40-year murder sentence and had not come forward before because he had no reason to testify.  He stated that he expected nothing in exchange for his testimony and had come forward to testify because he was "tired of the games" and knew defendant was not crazy.

John Bohr testified as he had in 
Stack III
.  He met defendant while they were both inmates at Menard's psychiatric unit in 1986.  Defendant told Bohr that he would tell the psychiatrists the same thing each time he saw them.  He told them that he saw demons and devils coming out of people's faces.  Defendant said he would continue "bugging up" until he had the staff, doctors, judges, lawyers and everyone convinced he was insane.  Defendant told Bohr that on the day of the murders, he and Carol had an argument about his drinking, drug use and lack of a job.  Defendant said he lost his temper and he and Carol began to fight.   Defendant said that during this fight, he beat and stabbed Carol repeatedly with a broken pool cue.  Defendant explained that his son then got in the way, and defendant grabbed him and hurled him against the wall.  Defendant explained that he tried to appear insane almost immediately because he knew he was in deep trouble.

 Joyce Kopecky, a nurse, testified for the defense.  Kopecky treated defendant at Holy Cross Hospital on May 11, 1980.  She stated that at the time of treatment defendant appeared psychotic  and agitated, was oblivious to pain and talked about demons.

Laura Doise, defendant's niece, testified as to defendant's behavior at her engagement party on May 3, 1980.  According to Doise, defendant stood in the middle of the room, alone, dancing and lip-syncing with a microphone for about an hour.  No one paid attention to defendant's behavior, but Doise had not seen defendant act that way before.

Prior to Doise's testimony, the State raised a motion 
in limine 
to exclude a statement defendant's wife made to Doise.  According to the State's motion, Doise would testify that days before the murder Doise was present when defendant whispered something to Carol, who then said, "yes, Richie all the little devils are going to get us." The trial court granted the State's motion 
in limine
 on the ground that the statement was hearsay.

Dr. Nageswararo Vallabhaneni testified that he treated defendant from October 1984 until 1993, while he was a patient in  the psychiatric unit at Menard.  He diagnosed defendant as suffering from chronic paranoid schizophrenia based on conversations in which defendant acted in a bizarre manner, suffered from delusions and talked about conversations with God. Dr. Vallabhaneni had no opinion as to defendant's sanity on May 11, 1980, the date of the murders.

Doctor Albert Stipes of the Psychiatric Institute testified as he did in 
Stack I
 and 
Stack III
.  Dr. Stipes opined that because defendant suffered from schizophrenia at the time of the murders, he lacked the substantial capacity to appreciate the criminality of his acts or the ability to conform his conduct to the requirements of law.

Doctor Robert Reifman also testified as he did in 
Stack I
 and 
Stack III
.  Dr. Reifman testified that, at the time of the murders, defendant suffered from paranoid schizophrenia and as a result was legally insane.  

The State called Dr. Linda Grossman, a clinical psychologist, as a rebuttal witness.  In April of 1996, Dr. Lihmeyer referred defendant's case to Dr. Grossman for a psychological assessment.  This was the first time since May 11, 1980, that a complete set of psychological tests had been administered to defendant. After evaluating the test results, Dr. Grossman concluded that defendant was exaggerating symptoms of mental disorder in a manner consistent with malingering.

On surrebuttal, defendant presented the testimony of three witnesses.  Dr. Roni Seltzberg, of the Psychiatric Institute,  testified that defendant suffered from a chronic psychotic mental disorder known as schizo-affective disorder bipolar type.  Dr. Seltzberg said that this disorder has the symptoms of schizophrenia in addition to those of depression.  She also stated that defendant had a "thought disorder" in 1980.  Dr. Seltzberg determined that her conclusions were consistent with defendant's behavior, including hallucinations and delusions that a devil or demon had taken over the bodies of his wife and child.  

Clinical psychologist Dr. Michael Rabin testified that during  the four occasions he examined defendant for the purpose of determining fitness for trial, he diagnosed him as having apparent schizophrenia.  Dr. Rabin also evaluated the psychological tests conducted by prosecution witness Dr. Grossman.  He concluded that the test results showed that defendant had schizo-affective disorder bipolar type, but did not indicate that defendant was malingering.

Dr. Jonathan Kelly, medical director of the Isaac Ray Center, testified for the defense.  Dr. Kelly conducted a four-hour examination of defendant on September 16, 1996.  It was his opinion that defendant suffered from paranoid schizophrenia on May 11, 1980.  He rendered this opinion based on events in the days before  May 11, 1980.  Primarily, Dr. Kelly referred to defendant's conversation with Father Lutz, a conversation with defendant's parents concerning "grandiose beliefs," other strange behavior towards family members, and a sudden interest in church and religion.  He also testified that on the basis of his interview with defendant and his review of all of defendant's psychological and psychiatric records, defendant was not fabricating symptoms.

After presentation of the evidence, the trial court, sitting as the trier of fact, made the following findings:

"I find that prior to 1980 there had been no history 

of mental illness.  I find that prior to and on that date

Mr. Stack was a social person and sought to be the center

attention.

I find that on that date there was a relationship-

and thereafter, there has been a relationship between Mr.

Stack's symptoms and the status of the case.

I find that he is a manipulator.  He has fooled some 

of the examiners and used his skills as a malingerer and

a manipulator in an attempt to avoid responsibility for his

actions.  He has failed in his attempt.

The State has met their burden.  I find Mr. Stack 

guilty of first degree murder beyond a reasonable doubt of 

the murder of his wife and son."

Defendant was subsequently sentenced to two concurrent life terms.

Defendant first contends that the trial court disregarded the prior rulings of this court and violated defendant's state and federal due process rights by allowing Officer Christopher to testify as to defendant's post-
Miranda
 silence and then improperly relied on this evidence in reaching its ruling.

In 
Wainwright v. Greenfield
, 474 U.S. 284, 295, 88 L.E. 2d 623, 632, 106 S.Ct. 634, 640-41 (1986), the Supreme Court determined that it is fundamentally unfair for the State to breach its implied promise by using post-
Miranda
 silence, including statements of intent to remain silent, as evidence of a defendant's sanity.  This court enunciated this holding in 
Stack I
, and in 
Stack II
 our supreme court held that 
Wainwright
 is the law in Illinois.

The record reveals that neither the State nor the trial court violated this principle at defendant's third trial. On appeal, de-

fendant points to the State's direct examination of Officer Christopher as being in violation of 
Wainwright
.  In testifying as to his observations of defendant's behavior at the crime scene, Officer Christopher testified in part:

"Q. [Assistant State's Attorney]: At the time you 

were with defendant on May 11
, 1980, did the defendant 

ever express to you any difficulty in understanding any 

of your requests or commands?

A. [Officer Christopher]: No.

[Defense Counsel]: Your Honor, objection; Doyle and prior 

rulings of the Court.

THE COURT: I'm sorry?

[Defense Counsel]: Your Honor, he's getting into an area 

which the Court in the prior appeal said he shouldn't get

into which is that unless he specifies the requests or the 

commands, he is including the Miranda warnings and his 

responses thereto.  That was one of the areas before which 

the Appellate Court –

 THE COURT: Most respectfully, most respectfully, most 

respectfully overruled.  You may answer the question.  In 

fact, you may want to rephrase your question.  I don't know.

That's up to you.

                               ***

Q. [Assistant State's Attorney]: Officer Christopher, 

you testified that you made a number of requests or commands

to the defendant at 6400 South Kildare on May 11, 1980, is 

that correct?

A. [Officer Christopher]: Yes, sir.

Q.  And did the defendant ever express to you any 

difficulty understanding any of your requests or demands.

A.  No, sir.

Q.  Each time you made a request or demand--excuse me--       or command of the defendant, did he respond immediately to 

your request or command?

A.  Yes, sir."

Defendant asserts that this exchange violated his con- stitutional rights.  However, at this trial, the questions posed by the prosecution to Christopher did not raise 
Miranda
 or defendant's responses to 
Miranda
 warnings.  Unlike the testimony at the prior trials, the State did not offer testimony or argument concerning defendant's receipt of 
Miranda
 warnings for the purpose of demonstrating that defendant was sane.  The prosecution did not ask Christopher any question concerning 
Miranda
.    

The first time that 
Miranda
 arose at trial was during the cross-examination of Officer Scott.  At that time, defense counsel asked the following questions:

"Q.  No, when he was alone with you in the hospital, he 

didn't say anything about God or demons, correct?

A.  Right.

Q.  He didn't say anything when he was alone with you, 

correct?

A.  Until I started questioning him for the information   for the arrest report.

Q.  He wasn't--he wasn't starting any conversations 

himself, was he?

A.  No.

Q.  He was just quiet or silent, correct?

A.  Right.

Q.  And those times he was quiet or silent, those all 

occurred after he had been given his Miranda warnings, 

correct?

[Assistant State's Attorney]: Judge, I'm going to object 

to this.  Is he trying to make an issue out of this now?

THE COURT: Excuse me.  Excuse me.  Overruled; you may 

answer.

Q. [Defense Attorney] Okay, he had been given his 

Miranda warnings before, right?

A. [Officer Scott] Yes.

[Assistant State's Attorney]: Motion to strike all of the

testimony about Richard Stack's silence while he was alone 

with the officer.

THE COURT: Overrule; proceed."

This colloquy shows that it was defense counsel who introduced the issue of 
Miranda
 warnings at trial.  The State, apparently sensitive to the issue of post-
Miranda
 silence after the first two trials, objected to defense counsel raising defendant's silence on cross-examination.  Thus, defendant is apparently raising an issue on appeal that he introduced at trial.  See 
People v. Howard
, 147 Ill. 2d 103, 168 (1991)(finding that a defendant may not invite error at trial in his own closing argument and then raise the issue on appeal).  For this reason, and the fact that the State never raised defendant's post-
Miranda
 silence during its presentation of evidence, we find that the State did not violate defendant's constitutional rights.

Defendant also contends that the trial court, sitting as the trier of fact, improperly considered his post arrest silence in finding him guilty.  Specifically, defendant refers to the trial court's findings made at the end of the case referring to defendant's actions in the emergency room: "There was also testimony that Mr. Stack's reaction or the way he was reacting to people differed depending on who was present at the time."  Defendant states that the trial court's finding "could only have been a reference to the testimony that Richard Stack mumbled about devils and demons" in the presence of nurse Kopecky but was silent when alone with Officer Scott.

While it is improper to introduce or rely on evidence of post -arrest silence to determine sanity, actions after the crime are relevant to the issue of sanity.  In 
Wainwright
, the Supreme Court noted that questions concerning a defendant's behavior may be asked as long as the questions do not implicate the defendant's exercise of constitutional rights.  
Wainwright
, 474 U.S. at 295, 88 L. Ed. 2d at 632, 106 S.Ct. at 640.  Therefore, the trial court did not err by relying on evidence of defendant's behavior in reaching its ruling.

Further, since this case was a bench trial, it is presumed that the trial judge considered only competent evidence in reaching his decision and this presumption is overcome only where the record shows that the court relied on improper evidence.  
People v. Lester
, 102 Ill. App. 3d 761, 768 (1981).  Here, the record shows that the court properly relied on the testimony of the officers regarding the defendant's actions after the murders, including the actions of defendant after being advised of his 
Miranda
 rights.

Defendant next contends that the evidence presented to the trial court demonstrated a reasonable doubt as to his sanity on May 11, 1980, thereby requiring reversal of his conviction.

At the time of the underlying offense, the Criminal Code of 1961 (Code) provided that "[a] person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."  Ill. Rev. Stat. 1979, ch. 38, par. 6-

2(a).  Under that version of the Code, the issue of a defendant's sanity at the time of an offense was an affirmative defense that required the defendant to introduce evidence sufficient to raise the issue of sanity and the State to then prove beyond a reasonable doubt that defendant was sane at the time of the crime.  
People v. Silagy
, 101 Ill. 2d 147 (1984).

Whether the State has met this burden is a question for the trier of fact.  
People v. Koch
, 306 Ill. App. 3d 634, 637 (1999).  The trier of fact's determination will not be reversed unless it is so improbable or unsatisfactory as to create a reasonable doubt as to defendant's sanity.  
People v. Glenn
, 233 Ill. App. 3d 666, 678 (1992).  When making a sanity determination, the trier of fact is free to accept the opinion of one witness over another or accept part and reject part of each expert's testimony.  
People v. Sojak
, 273 Ill. App. 3d 579, 587 (1995); 
People v. Tylkowski
, 171 Ill. App. 3d 93, 99 (1988).  In 
Sojak
, two clinical psychologists and one psychiatrist testified that the defendant was insane at the time he killed his wife and two children.  The State presented the testimony of one psychiatrist who testified that the defendant was sane.  This court affirmed the trial court's finding that defendant was guilty but mentally ill.

In both 
Stack I
 and 
Stack III
, this court rejected defendant's sufficiency of the evidence arguments on the ground that the evidence adduced at trial presented a question of fact to be resolved by the jury, following a fair and impartial trial.  The instant case was a bench trial with a judge sitting as the trier of fact.  The trial judge in this case listened to numerous lay witnesses testify as to defendant's mental condition in the days before and including the day of the murders.

The trial court also heard testimony from several expert witnesses as to defendant's sanity at the time of the murders.  Dr. Stipes, Dr. Reifman, and Dr. Kelly all testified that defendant was insane at the time he committed the murders.  Dr. Lihmeyer testified that he did not believe that defendant was being truthful in describing the delusions he allegedly suffered from and it was his opinion that defendant was malingering.  Dr. Grossman testified that she administered psychological tests to defendant and she concluded that defendant had fabricated symptoms of mental illness.  Thus, the experts disagreed as to defendant's mental condition, the causes of his behavior and the authenticity of defendant's description of his mental state.

In light of the varied and conflicting testimony presented at trial, the trial court's conclusion was not so improbable as to create a reasonable doubt as to defendant's sanity.  The conflicting evidence raised a question of fact and the highly experienced trial judge, as trier of fact, was entitled to resolve that question against defendant.  We therefore affirm the trial court's decision on this issue.

We next address whether defense witness Laura Doise should have been allowed to testify as to a statement Carol Stack made to defendant at a party prior to May 11, 1980, and a statement Carol made to her.  Defendant asserts that Laura Doise would have testified that while speaking with defendant, and after he had whispered something in her ear, Carol said, "yes, Richie, all the little devils are going to get us." The trial court refused to allow this testimony on the ground that it was inadmissible hearsay. 

The admission of evidence is within the sound discretion of the trial court, and a reviewing court will not reverse the trial court unless that discretion is abused.  
Estate of Parks v. O'Young
, 289 Ill. App. 3d 976, 980 (1997), citing 
Gill v. Foster
, 157 Ill. 2d 304 (1993). 

Defendant argues here that Carol's statement about "little devils" was circumstantial evidence that defendant spoke to her about devils and also was evidence of his delusional state of mind. Therefore, defendant asserts, Carol's statement was ad- missible under 
People v. Vanda
, 111 Ill. App. 3d 551 (1982). 

In 
People v. Bowel
, 111 Ill. 2d 58 (1986), our supreme court held that the question to be considered in deciding the admissibility of an extrajudicial statement is whether it was made under circumstances which provide "'considerable assurance' of its reliability by objective 
indicia
 of trustworthiness."  
Bowel
, 111 Ill. 2d at 67.  Among the factors cited by the supreme court in excluding an extrajudicial statement were the facts: (1) that the witness to the extrajudicial statement was not a party to the claimed conversation; (2) that the witness may not have heard the whole conversation; (3) the declarant was not available for cross-

examination by the prosecutor; and (4) the trial court did allow testimony which was apparently substantially the same as the proposed testimony of the witness who overheard the alleged conversation.  
Bowel
, 111 Ill. 2d at 68-69.  All of these factors weighing against admission of an extrajudicial statement were present in the instant case.  Further, there is no way of knowing what defendant said to Carol.  Therefore, Doise's testimony as to Carol's statement would not have been evidence of defendant's mental state.

Defendant also argues that even though Carol's statement at the party could not be cross-examined, Laura should have been allowed to testify as to the content of Carol's statement under the present sense impression exception to the hearsay rule.

According to the Federal Rules of Evidence (see Fed. R. Evid. 803(1)), a present sense impression is a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."  The present sense impression exception has three requirements: (1) that the statement describe or explain the event perceived; (2) that the declarant must have in fact perceived the event described; and (3) that the statement must be substantially contemporaneous with the event in question.  
Estate of Parks
, 289 Ill. App. 3d at 982, citing 
United States v. Mejia-Velez
, 855 F. Supp. 607, 613-14 (E.D.N.Y. 1994).  

In 
Estate of Parks
, this court noted that the present sense impression exception has not been adopted in Illinois (
Estate  of Parks
, 289 Ill. App. 3d at 982), and that even under the Federal Rules of Evidence, the exception does not apply when the declarant "was not reporting to or discussing with Parks [plaintiff] his observations of an event that was occurring contemporaneously with his remarks."  
Estate of Parks
, 289 Ill. App. 3d at 983.  Accordingly, we find that Doise's proposed testimony would not satisfy the three-part test for the present sense impression exception.  First, her testimony regarding Carol's statement, "yes, Richie, all the little devils are going to get us" does not describe or explain an event that Carol perceived.  
Cf
. 
Mejia-

Velez
, 855 F. Supp. 613-14 (evidence of an eyewitness' 911 call reporting a shooting admissible as a present sense impression).  Second, Doise did not hear what defendant said to Carol and the act of whispering is not a real event for the purposes of the exception.  Based on the facts, defendant has not presented a compelling argument for this court to adopt present sense impression as a new exception to the rule of hearsay in Illinois.  We find that the trial court did not abuse its discretion in granting the State's motion 
in limine
 and limiting Laura Doise's testimony.

Defendant next contends that the trial court erred when it refused to grant his request to take evidentiary depositions of emergency room nurse Marge Galfano and examining psychologist Dr. Joseph Garvin.  At trial, defense counsel informed the court that Galfano was unable to testify because she was bedridden, and that Dr. Garvin was 77 years old, retired, lived in St. Louis, and had a heart condition.  The court stated that it would reserve ruling on the motion and would permit the defendant to reopen the motion.  Defendant did not raise this issue again until his posttrial motion.

We find that defendant has waived this issue for appeal.  In 
People v. Redd
, 173 Ill. 2d 1, 35 (1996), the supreme court addressed the issue of waiver when a judge reserves ruling on a motion and held that "[a] movant has the responsibility to obtain a ruling from the court on his motion to avoid waiver on appeal." The court reasoned that the defendant, who proceeded 
pro se
, had the burden to track the motions and monitor their disposition.  
Redd
, 173 Ill. 2d at 35.  Similarly, in 
People v. Thompkins
, 161 Ill. 2d 148, 159 (1994), the supreme court found that defense counsel's failure to obtain a ruling on his motion to permit further discovery waived the issue for appellate review.  Thus, we find that the defendant's failure to obtain a ruling from the trial court on the issue of evidence dispositions resulted in waiver on appeal.  See 
People v. Pasch
, 152 Ill. 2d 133 (1992). 

Further, the testimony of Galfano would have been cumulative to that of Joyce Kopecky and Officer Scott.  Likewise, Dr. Garvin's testimony would have been very similar to that of Dr. Stipes, Dr. Reifman and Dr. Kelly.   Such cumulative testimony may properly be excluded.  See 
People v. Ward
, 101 Ill. 2d 443 (1984).  The trial court's findings relied heavily on the defendant's lack of a history of mental problems prior to the day of the murders and that subsequently the defendant was manipulating the examiners.  Neither Galfano's nor Dr. Garvin's proferred testimony would have been contrary to this finding.  Accordingly, it is apparent that defense counsel's failure to raise the issue did not deny defendant a fair trial; thus, there was no prejudice.  

Defendant next contends that the trial court erred by not allowing the defense expert witnesses to testify as to several different issues.   

The scope of direct and cross-examination of witnesses is a matter within the discretion of the trial court, and a court of review will not find error unless the trial court abused that discretion.  
People v. Devine
, 295 Ill. App. 3d 537, 541 (1998). We have reviewed the record below and find that the court did not abuse its discretion in sustaining objections to questions asked on direct of Dr. Seltzberg and Dr. Kelly regarding whether "flight" is "generally" evidence of sanity or insanity.  We further find that the trial court did not abuse its discretion in sustaining State objections to questions asked of Dr. Stipes as to: (1) how many doctors had concluded that defendant suffered from a mental disease; and (2) the number of doctors who had diagnosed defendant as suffering from antisocial personality disorder.  The number of experts who testified to different diagnoses is not relevant to this case.  See 
People v. Wheeler
, 194 Ill. App. 3d 178 (1990).

Defendant next asserts that the trial court erred in not allowing emergency room physician Dr. Caseley to testify as to defendant's mental condition during the hours after the murders.  The record does not support this claim of error.  The court sustained a State objection to Dr. Caseley's testimony that "I didn't feel that he was a normal person psychiatrically."  While a witness may offer an opinion as to an individual's mental condition based on personally observed facts, a party must still establish a proper foundation for this evidence.  
Stack III
, 244 Ill. App. 3d at 182-83.  The court did allow Dr. Caseley to testify: (1) why she thought defendant was "not normal"; (2) that after examining defendant she did not reach a conclusion that he was psychotic; and (3) that defendant did not seem to be in contact with reality.  The  trial court properly sustained the one objection complained of.

Defendant next asserts that the trial court erred in not allowing Detective Foley to testify as to a prior consistent statement by Father Lutz.  The law is well settled in Illinois that prior consistent statements are generally inadmissible.  
People v. Montgomery
, 254 Ill. App. 3d 782, 792 (1993).  A narrow exception to this rule does emerge when it is alleged that the testimony at issue is recently fabricated or that the witness has some motive for testifying falsely and the prior consistent statement was made before the motive to fabricate arose.  
People v. Harris,
 123 Ill. 2d 113, 139-40 (1988).  However, evidence of a prior consistent statement is not admissible to rebut a charge of mistake or inaccuracy.  
People v. Miller
, 302 Ill. App. 3d 487, 492 (1998).

Father Lutz' testimony was essentially the same in all three trials.  No one asserted that his testimony was recently fabricated or that he had a motive to testify falsely.  The trial court ruled correctly in not allowing Detective Foley to testify as to Father Lutz' prior consistent statement.

Defendant's final contention concerns the testimony of Dr. Lihmeyer.  Defendant argues that the trial court erred in restricting the cross-examination of Dr. Lihmeyer as to his theory that the fact defendant did not flee after the murders was evidence tending to show that he was sane.  Again, the record does not support this assertion.  On cross-examination defense counsel asked Dr. Lihmeyer, "Now, of course, if he had tried to escape it could easily [be] argued that that showed consciousness of guilt and appreciation that his actions were wrong, correct?"  The trial court sustained an objection to this question.  We find that this was not an abuse of the trial court's discretion.  The trial court allowed extensive cross-examination of Dr. Lihmeyer.  The question at issue assumed facts not present in the case.  We note further that the fact defendant did not flee is consistent with his statement to John Bohr that he almost immediately tried to appear to be insane.  Flight is not necessarily a "sane" option to an  individual who is penniless and has just killed his wife and child during a period when family members knew of their severe marital discord.  Under the circumstances of this case, what inferences may best be drawn from such conduct is properly the province of the trier of fact.

Defendant also asserts that the trial court improperly sustained objections to questions concerning Dr. Lihmeyer's salary when he resigned from a position at Northwestern University, his bias to the side that retains him, the way he lost a tenured position at Northwestern, and whether he planned to take legal action in his dispute with Northwestern.  The admissibility of evidence that is collateral to an issue in a case and that is intended to affect the credibility of a witness rests within the sound discretion of the trial court, and the decision to exclude certain collateral evidence will not be disturbed absent an abuse of discretion.  See 
People v. Renslow
, 98 Ill. App. 3d 288, 293-94, (1981).  We find that none of the questions that defense counsel asked had any real relevance to Dr. Lihmeyer's qualification or credibility, and, therefore, we find no error.

For all of the reasons stated above, we affirm the judgment and sentence of the trial court.

Affirmed.

CAMPBELL, P.J., and ZWICK, J., concur.