2016 IL App (1st) 132785

FIRST DIVISION
March 7, 2016

No. 1-13-2785

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 16440 |
| | ) | |
| TREBLE ABRAM, | ) | Honorable |
| | ) | Timothy Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE LIU delivered the judgment of the court, with opinion.
Justice Connors and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    On July 28, 2009, two police officers patrolling the West Woodlawn neighborhood of Chicago responded to a call that three males with rifles had been spotted in that area. Upon noticing defendant, Treble Abram, sitting alone inside a vehicle in an alley, the officers exited their squad car and started walking toward him. Defendant immediately drove his car, in reverse, out of the alley and sped away. A vehicle chase ensued for several minutes, and ended when defendant drove into the parking lot of a police station and was taken into custody. During the trial, various police officers involved in the chase testified that they saw items being tossed out the driver-side window of defendant's vehicle during the pursuit. The State also presented evidence demonstrating that substances containing cocaine were recovered from locations along the chase route and from the driver seat in defendant's vehicle.

¶ 2    The jury found defendant guilty of possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(A) (West 2012)), and the circuit court sentenced him to seven years' imprisonment. On appeal, defendant contends that: (1) the circuit court erred in denying his motion to suppress where the officers lacked reasonable suspicion to detain defendant when they saw him in the alley; (2) the court improperly denied his request to ask prospective jurors questions to reveal race- or drug use-related bias; (3) an audio recording of officers' statements during the car chase should have been excluded as hearsay; (4) a proper chain of custody was not maintained for the narcotics evidence; and (5) the State failed to establish defendant's guilt beyond a reasonable doubt.  We affirm.

¶ 3                                  BACKGROUND

¶ 4                        A.  Defendant's Motion to Suppress

¶ 5    Prior to the trial, defendant brought a motion to quash his arrest and suppress any directly or indirectly obtained evidence. Defendant argued that, when the police officers initially approached him in the alley, he was not breaking any law and there was no probable cause to arrest him. Officer Szubski testified to the following during the hearing on the motion to suppress. On July 28, 2009, he and his partner responded to a call about individuals with rifles who had been seen near 61st Street and South Eberhart Avenue in Chicago. While patrolling the area, they saw defendant seated alone in a '95 Chevy Impala, in the east alley of South Eberhart Avenue. The vehicle was missing a front license plate and was obstructing the alley. The officers stopped their squad car and approached defendant on foot to conduct a field interview.

¶ 6    According to Officer Szubski, as they approached him, defendant started "making some movements" and then "threw his vehicle in reverse and fled from us." The officers then pursued

defendant, with lights and sirens on, for approximately 11 minutes.[1] During this time, defendant disobeyed traffic signals, drove "erratically," and drove "down numerous alleys, side streets, through vacant lots, over sidewalks and major thoroughfares." Officer Szubski admitted that he did not mention these infractions specifically in the incident report that he authored after the chase; he also agreed that at no time did he see a weapon in defendant's possession or any other occupant in the vehicle. The chase ended when defendant pulled into and stopped in the parking lot of the Third District police station, at which point he was taken into custody. Officer Szubski stated that, at several points during the car chase, he observed defendant move as if he was reaching under his seat and then throw something out through the driver-side window. Although he was not present when the discarded items were recovered by other officers, he later saw the items and testified that, based on his experience and training, he believed them to be crack cocaine. Officer Szubski issued defendant tickets for fleeing and eluding officers and missing a front license plate, but not for obstructing the alley.

¶ 7     The defense presented testimony from defendant's father, James Otis, and Kimberly Pritchett, the owner of the Chevy Impala. Mr. Otis testified that, on July 28, 2009, defendant was helping him work on a building at 6147 South Eberhart Avenue, and had parked the Impala on a concrete slab where a garage used to be. Mr. Otis admitted that he was not present when the officers approached his son and that defendant may have pulled off of the slab and into the alley at that time. Ms. Pritchett testified that she had lent her vehicle to defendant sometime prior to July 28, but that it had both a front and rear license plate when she saw it last. On cross examination, however, she admitted that there had been a problem with the front license plate and she could not be sure it was in place on July 28.

---

[1]     Officer Szubski testified that he was later told by his supervisor that the chase lasted 11 minutes. At trial he testified that it lasted for only six minutes.

¶ 8    The circuit court denied the motion to suppress and granted the State's motion for a directed finding that probable cause had existed for defendant's arrest. Because the testimony presented established that defendant fled from the police and tossed items from his vehicle, the court concluded "[t]here [wa]s before [it] no possible other explanation as to how it happened."

¶ 9                    B.  State's Motion to Introduce the Police Call-Out Tape

¶ 10    Prior to trial, the State filed a motion *in limine* seeking permission to introduce an Office of Emergency Management Communications (OEM) audio recording in which Officer Szubski "called out" details regarding the route defendant's vehicle traveled during the July 28 chase. The State argued that the recording was admissible under both the present sense impression and excited utterance exceptions to the rule against hearsay, explaining that the recording consisted of Officer Szubski's statements alerting his fellow officers to defendant's movements as the chase unfolded, and that the circumstances under which they were made would naturally produce spontaneous and unreflecting statements by the officer, thus eliminating the risk of fabrication.

¶ 11    During the hearing on the State's motion, defendant argued that: (1) the recorded statements were entirely duplicative of, and would only serve to improperly bolster, the officers' live testimony at trial, and (2) the sirens and other sound effects audible in the recording would confuse or distract the jury. He further contended that the recorded statements in the recording did not qualify as excited utterances because they were not made under the same sort of pressure or with the same urgency as the types of statements courts deemed admissible in the authority cited by the State, and, in some instances, were proven to be unreliable.[2] The circuit court granted the motion, concluding that the "audio recording in real time of [a] police officer describing his observations as he is following [defendant]," was "pretty compelling stuff ***

---

[2]    Defendant referred to, as an example, statements made by an officer and police dispatch when the officer mistakenly believed the defendant may have tossed a gun out of the window of the vehicle.

qualifying both as an exception to the rule against hearsay under [the] present sense impression and as an excited utterance through a spontaneous declaration."

¶ 12                                    C. *Voir Dire*

¶ 13    A jury was selected for defendant's trial from two venire panels. During its preliminary *voir dire* proceeding, the circuit court explained to the prospective jurors that "a defendant is presumed to be innocent of the charge against him" and that "[t]his presumption remains with him throughout every stage of the trial *** and is not overcome unless from all the evidence you are convinced beyond a reasonable doubt that the defendant is guilty." The court also explained that "the testimony of a police officer is not to be treated any differently than any other witness's" and that such testimony "is entitled to no greater or lesser weight than any other person's testimony simply because of that person's status as a police officer."

¶ 14    Afterwards, the circuit court cautioned both panels as follows:

> "It is essential that you not arrive at any decisions or conclusions of any
>
> kind until you have heard all the evidence, the arguments of the attorneys, and my
>
> instructions on the law ***."

¶ 15    After questioning the members of the venire individually, the circuit court invited the parties' attorneys to ask additional questions. Counsel for both sides questioned the first panel but declined to question the second.  Neither side asked any questions relating to race- or drug use-related bias of any of the potential jurors.[3]  When a potential juror indicated that her son was

---

[3]    The issue of race did arise during a jury selection conference. Defense counsel expressed her concern that many African-American jurors were being dismissed for cause. Noting that there were a substantial number of African-Americans in the venire, in the 28 individuals randomly selected for questioning by the court, and in the group of 12 persons not yet called, the circuit court stated "I'll caution everybody that we are running out of African-American people and this is of concern to me." In a ruling not challenged on appeal, the circuit court also denied a motion made by defendant pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), finding that the State's challenges for cause were made "in eminent good faith and were not designed as a pretext." It further noted that the State had accepted three African-American jurors and

murdered under what the court described as circumstances she believed "stem[med] from some aspect of drug trade on the south side," the court suggested that she be dismissed for cause and the parties agreed.

¶ 16                              D.  Evidence Presented at Trial

¶ 17                                  1. Encounter in the alley

¶ 18     Officer Szubski's testimony at trial was generally consistent with the account he provided at the hearing on the motion to suppress; however, he provided a number of additional details regarding the events leading to defendant's arrest. He testified that, at approximately 7:30 p.m. on the date of the incident, he and his patrol partner drove to the intersection of 61st Street and South Eberhart Avenue in response to a call about three males with rifles in the area. They noticed defendant sitting in a black Chevy Impala with a missing front license plate in the nearby alley, facing southward. The car was obstructing the alley. The officers pulled into the alley facing northward, exited their squad car, and walked toward defendant to conduct a field interview. Officer Szubski testified that defendant then "put the vehicle in reverse and proceeded to flee." Although he yelled for defendant to stop, defendant instead backed out of the alley and drove eastbound on 61st Street, at which point the officers returned to the squad car, turned on their lights and sirens, radioed for assistance, and "gave chase" after defendant.

¶ 19     When asked about his reasons for approaching defendant in the alley, Officer Szubski stated that he and his partner approached defendant's vehicle "[t]o conduct an investigation," "[t]o see if [defendant] was involved with the person with a gun call." He explained that defendant's vehicle "could be related as far as a getaway car to the men with guns call" and that

---

exercised its peremptory challenges in a nondiscriminatory manner, against Caucasians and African-Americans of both sexes.

"[t]here was [*sic*] a lot of variables." On cross examination, Officer Szubski conceded that there were no men with guns in the area of 62nd Street and South Eberhart when they arrived, that he saw no weapons on defendant, and that there were no warrants or investigative alerts for defendant. When asked if he had any other reason to believe defendant was armed, Officer Szubski stated: "In my training and experience, many times a getaway car is used in the commission of offenses. That was my initial thinking at the time."

¶ 20                                    2. The vehicle chase

¶ 21     Along with several other police officers involved in the car chase, Officer Szubski testified at trial about his observations during the pursuit and the items recovered from various sites along the chase route. Officer Szubski stated that he and his partner pursued the Chevy Impala for approximately six minutes, while simultaneously communicating defendant's location and movements to other officers and police dispatch by radio. Officer Szubski's statements in the OEM audio recording, which was published to the jury, were consistent with his trial testimony about defendant's actions during the chase: that defendant exceeded the speed limit, drove in the wrong direction on one-way streets, crossed lanes of traffic, drove through a vacant lot, and drove onto a sidewalk to evade pursuing officers, finally stopping in the parking lot of the Third District police station near Cottage Grove Avenue, where he was taken into custody by officers from the Third District tactical team. Officer Szubski's Traffic Pursuit Report indicated that defendant was speeding and weaving, but it did not indicate that he drove the wrong way down one-way streets or drove on the sidewalk.

¶ 22                        3.  Items recovered from the chase and vehicle

¶ 23     Officer Szubski additionally testified that, as he was pursuing defendant, he saw defendant toss an object from the driver-side window of the car at three separate locations. He

stated that it was still light outside and, in each instance, he was approximately one car-length away from defendant's vehicle with nothing obstructing his view. He admitted on cross examination, however, that although he saw defendant's arm extending out the window, he never saw defendant's hand or any object in his hand. Furthermore, he could not see what the discarded items were, and he was not present when they were collected. He stated that he later saw the substances and, based on his experience and training, believed them to be crack cocaine.

¶ 24    The State also presented testimony from Officers Michael Shrake, Aaron Petrulis, Carla Watkins, Matthew Normand, and Victor Ramirez regarding the events of July 28, 2009. These officers all testified that they were on patrol duty when they heard either the initial "person with a gun" radio broadcast and/or Officer Szubski's subsequent broadcasts during the car chase.

¶ 25                                    *People's Exhibit No. 2*

¶ 26    Officers Watkins and Normand encountered defendant's vehicle on South Martin Luther King Drive. Watkins testified that she and her partners were driving northbound when they saw the black Impala driving toward them—heading southbound near 6400 South Martin Luther King Drive, followed by a marked squad car with its lights and sirens on. Officer Watkins testified that, from a distance of between five and ten feet, she observed the driver, whose face was not visible to her, throw a white, rock-like substance from the driver side window. After telling her partner to stop the car, she stepped out and picked up the object from the bus lane before returning to the squad car to continue with the chase. Officer Watkins testified that there was nothing else in the street near the recovered items and, from the time she saw the item thrown from the vehicle to the time she recovered it, she never lost sight of it and thereafter kept it in her constant care, custody, and control until she arrived at the Third District police station, when she gave it to Officer Szubski. She did not remember, however, what she picked it up with

or specifically where she put it other than that she held onto it; she stated that she did not put it in her pocket or on the seat of the car next to her. Based on her experience, including approximately 20 cocaine arrests, she believed the substance to be cocaine.

¶ 27    Officer Watkins then identified People's Exhibit No. 2 as the item she recovered, with her name listed on the inventory bag, and testified that it was in substantially the same condition as when she recovered it. Defendant sought to bar admission of this evidence, arguing the chain of custody was uncertain during the period in which Officer Watkins testified that she could not remember what she did with the rock she retrieved. The circuit court rejected this argument and denied the motion, noting that, "notwithstanding Officer Watkins' lack of uncertainty with respect to how she processed that material *** she did testify, without qualification, that she had it in her custody, care and control continually from the time she recovered it off the street *** until she gave it to Officer Szubski."

¶ 28    Officer Normand confirmed that Officer Watkins exited the squad car to retrieve an item she saw thrown from the black Impala. He testified that, when she returned, she put the substance in a rubber glove she had in her vest, where she kept it until she turned it over to Officer Szubski at the Third District police station. Officer Normand identified People's Exhibit No. 2 as the substance recovered by Officer Watkins and testified that, apart from the absence of the rubber glove, it was in substantially the same condition as when she recovered it.  Although he was present when Officer Szubski sealed the evidence bag, Officer Normand could not remember if the rubber glove was in the bag at that time or if it had been removed. On cross-examination, he agreed that the substance was collected in the vicinity of the housing development called Parkway Gardens, where he had personally made many cocaine arrests in the past.

¶ 29    Officer Szubski testified that he received the item identified at trial as People's Exhibit No. 2 from Officer Watkins at the police station, after she purportedly collected it from the street. He inventoried the item according to police procedures; he filled out an electronic form, obtained approval and the appropriate signatures, heat sealed the evidence bag, and placed it in a safe where someone from Evidence and Recovered Property would take it to the Illinois State Police crime lab for testing. Officer Szubski was not questioned regarding the presence or absence of a rubber glove in the inventory bag given to him by Officer Watkins.

¶ 30                                    *People's Exhibit No. 14*

¶ 31    Officer Shrake testified that he and officers Petrulis and Roque were at the intersection of 62nd Street and South Eberhart Avenue when he observed defendant driving a black Chevy Impala westbound on 62nd Street, an eastbound street. According to Officer Shrake, "the driver had a bag in his left hand and he was shaking it and banging it against the side of the driver's door" and "[a] white rock-like substance and smaller white rock-like substance" fell out of the bag into the middle of the street. Officer Shrake immediately exited the squad car, ran to where the items were in the middle of the street near 517 East 62nd Street, and stood there while his partners left to join the chase. Approximately six minutes later, his partners returned with evidence bags and, pursuant to instructions radioed by Officer Szubski, he put the items he had been watching over in an inventory bag and brought them to the police station. Officer Shrake stated that he was approximately 125 feet away when he observed the items fall, it was light outside, nothing obstructed his view, he had no problem finding the items, they never left his sight, and they were in his constant care, custody, and control. Based on his experience, including over 100 narcotics arrests, he believed without a doubt that the items were crack cocaine. He additionally explained that, although he initially thought a gun was recovered and

called this out over the radio, he was mistaken; what he saw was simply another officer picking his own gun up and holstering it.

¶ 32    Officer Shrake testified that, once at the police station, he followed Chicago police department procedures to inventory the items he collected: he used a police computer program to enter information, was assigned a numbered inventory control label, obtained the desk sergeant's signature, sealed the substance in the evidence bag, and placed it in a safe. He identified People's Exhibit No. 14 as the same inventory bag with his signature and description of the items inside and testified that, other than signs that the substance had been tested by the crime lab, it was in substantially the same condition as when he recovered it.

¶ 33                                 *People's Exhibits Nos. 15 and 16*

¶ 34    Officer Petrulis identified People's Exhibit No. 15 as the evidence bag with the substance that he recovered from the route that defendant drove during the car chase.  He testified that, not only had he heard over the radio that items were thrown from defendant's vehicle, but he also saw the object as it was tossed from the driver side window. He stated that nothing was obstructing his view and it was still light outside. He told his partner to stop the car in the middle of the southbound lane near 6211 South Martin Luther King Drive, where he saw a white object sitting in the middle of the lane, picked it up and put it in an evidence bag he brought with him from the squad car. Based on his training and experience, including hundreds of narcotics arrests, he believed the object he recovered was crack cocaine.

¶ 35    When the car chase concluded, Officer Petrulis went to the Third District police station, where he saw defendant standing outside of his vehicle with at least a dozen other officers present. He approached the vehicle, looked inside, and saw a "white rock-like substance" sitting on the driver side seat. Officer Petrulis recovered this item and placed it in an evidence bag,

proceeded to search the car, and collected a plastic bag and more broken up pieces of the same white substance on the driver seat. He identified People's Exhibit No. 16 as the evidence bag with his signature and handwriting on it containing the items collected from defendant's vehicle.

¶ 36    Officer Petrulis testified that both People's Exhibits Nos. 15 and 16 were in substantially the same condition as they were in when he collected them, and explained that after he "wrote up the bag, [he] went into the Chicago Police CLEAR system where [he] obtain[ed] an inventory number and actually enter[ed] all the information into the inventory system, went to the desk sergeant, got it approved, got his approval signature on the bag, sealed the bags, and received the receipts for those inventories."

¶ 37    Officer Ramirez testified that he was on patrol with his partner in an unmarked police car when they heard radio communications giving the whereabouts of defendant's vehicle and made their way to the area described. Officer Ramirez testified that he was the one who removed defendant from his vehicle at the Third District police station and arrested him. At that point, Officer Ramirez saw "[a]bout a cookie-size white rock-like item," a plastic bag, and some crumbs beneath defendant on the driver seat.  He was unable, however, to positively identify People's Exhibit No. 16 as the substance he saw in the plastic bag.

¶ 38                             4.   Quantity and value of substances

¶ 39    Forensic scientist Katherine Frost Klimek is employed by the Illinois State Police's Division of Forensic Services. She identified People's Exhibits Nos. 2, 14, 15, and 16 as narcotics evidence bags she received for testing on July 30, 2009 from drug chemistry evidence technician Allen Calendo. She testified that she took physical custody of this evidence, confirmed that the bags were heat sealed and that the information on the bags matched the attached paperwork, and locked the bags in a drawer in her workstation until she began her

analysis on August 3, 2009. Ms. Frost described her analysis in detail: she wrote a detailed description of each sample, weighed it, and performed two preliminary color tests and two gas chromatography-mass spectrometry tests to identify compounds. She testified that the tests she performed are generally accepted in the scientific community for analyzing the presence of cocaine. Ms. Frost determined that the samples all tested positive for cocaine. The weight of the samples collected from the path of the defendant's vehicle were as follows: People's Exhibit No. 2 (1.006 grams); People's Exhibit No. 14 (3.135 grams); People's Exhibit No. 15 (0.311 grams). The sample collected from inside the vehicle (People's Exhibit No. 16) was over 25 grams. On cross-examination, Ms. Frost confirmed that People's Exhibit No. 2 did not contain a rubber glove when she took custody of it.

¶ 40    Officer Brian Luce, of the Chicago police department's Bureau of Organized Crime, Narcotics, testified that he has participated in hundreds of narcotics arrests and is familiar with how cocaine is packaged for street level sales. He explained that cocaine is typically sold on the street in the amount of 0.1 grams for $10, *i.e.*, a "hit," "dime bag," or "rock" of cocaine. He further testified that a serious user of crack cocaine might, on average, use five rocks in a single day, or a total of 0.5 grams. Officer Luce testified that, based on his experience and training, People's Exhibits Nos. 2, 14, 15, and 16, taken together, comprised a total of 297 hits, with an estimated street value of $2,970, an amount he believed was inconsistent with personal use.

¶ 41                      G. Motion for Directed Verdict, Verdict, and Posttrial Motion

¶ 42    At the close of the State's case, the circuit court denied defendant's motion for a directed verdict. On March 20, 2013, the jury found defendant guilty of possession with intent to deliver 15 grams or more but less than 100 grams of a substance containing cocaine. Defendant moved for a judgment of acquittal or a new trial, claiming the same errors appealed from here. The

circuit court heard argument and denied the motion in its entirety, noting that, had it presided over the hearing on the motion to suppress, it "would have concluded that there was no stop, let alone a *Terry* stop," as the defendant "was never stopped until he drove into the station at the Third District *** committing numerous traffic offenses which by themselves would have justified the police arresting [him]." The circuit court concluded both that the *voir dire* conducted in the case was proper and that "the court's refusal to ask the questions requested by [defense counsel] was appropriate." It further held the statements made in the police call-out tape were properly admitted as excited utterances and present sense impressions, an adequate chain of custody for narcotics evidence was established, and "the evidence resoundingly proved [defendant's] guilt beyond a reasonable doubt."

¶ 43                                    JURISDICTION

¶ 44    The circuit court sentenced defendant on May 21, 2013 and denied his motion for reconsideration of that sentence on July 31, 2013. Defendant timely filed his notice of appeal on August 20, 2013. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 45                                     ANALYSIS

¶ 46    On direct appeal, defendant urges this court to reverse both the circuit court's denial of his motion to suppress and his conviction or, in the alternative, to vacate his conviction and remand for a new trial. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 47                              A. Motion to Suppress

¶ 48    Defendant first contends the circuit court erred in denying his motion to quash arrest and

suppress evidence because, at the time he fled from the police, they had neither reasonable suspicion to detain him nor probable cause to arrest him. Defendant points out that the officers arrived on the scene looking for a group of three men with rifles but instead found defendant seated alone in his car in the alley behind a home owned by his family with nothing in his hands. Although he disputes that his car was blocking the alley, defendant further contends that, even if it was, the officers could not have reasonably inferred from this violation of a civil parking ordinance that he was committing, about to commit, or had committed a criminal offense. Finally, defendant argues that flight, by itself, does not give rise to reasonable suspicion.

¶ 49    In response, the State argues that defendant's claim of a fourth amendment violation "rests on the false premise that there ever was a stop in the alley" when "[i]n fact, defendant fled before police stopped him." According to the State, "defendant was not seized until the police arrested him in the parking lot of the police station," by which time he had committed numerous traffic violations and tossed suspected cocaine from his vehicle. Even if the officers approaching defendant in the alley constituted a stop, the State alternatively argues that probable cause existed where defendant had no front license plate and was obstructing the alley.

¶ 50    A circuit court's ruling on a motion to suppress evidence is subject to a two-prong standard of review. *People v. Johnson*, 237 Ill. 2d 81, 88 (2010) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). We afford deference to a circuit court's findings of fact, disregarding those findings only where they are against the manifest weight of the evidence. *Id.* We review *de novo*, however, a circuit court's ultimate legal ruling as to whether suppression is warranted. *Id.* at 88-89. We may consider both evidence presented at the suppression hearing and at defendant's trial. *People v. Almond*, 2015 IL 113817, ¶ 55.

¶ 51    Both the United States Constitution and the Illinois Constitution protect individuals from

unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Not every encounter between a police officer and a private citizen, however, involves a seizure or restraint of liberty implicating the fourth amendment. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006). A person is seized " 'only when, by means of physical force or a show of authority, his freedom of movement is restrained,' " *i.e.*, if "considering the totality of the circumstances, a reasonable person would believe he is not free to leave." *Almond*, 2015 IL 113817, ¶ 57 (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)).

¶ 52    In *Terry v. Ohio*, the Supreme Court held that, even in the absence of probable cause sufficient for an arrest, a police officer may stop and question an individual where the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." 392 U.S. 1, 30 (1968). In Illinois, this principle is codified in our Code of Criminal Procedure of 1963. 725 ILCS 5/107-14 (West 2008). An officer "must have a reasonable, articulable suspicion that a person has committed or is about to commit a crime, to justify stopping that person." *People v. Kipfer*, 356 Ill. App. 3d 132, 137 (2005) (citing *Terry*, 392 U.S. at 22). Our supreme court has elaborated on this requirement of reasonable suspicion, noting that "[t]he facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her." *People v. Thomas*, 198 Ill. 2d 103, 110 (2001) (*Thomas II*). "Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly. The facts supporting the officer's suspicions need not meet probable cause requirements, but they must justify more than a mere hunch." *Id.*

¶ 53    We first consider if and when a seizure occurred. Defendant contends that, in concluding that no stop occurred until the car chase ended, the circuit court missed the "initial violation" of

his rights when officers approached him in the alley. We cannot agree. Defendant was not "seized" when the officers merely exited their vehicle and approached him in the alley to conduct an investigative interview. In so doing, the officers applied no physical force, made no show of authority, and did not restrain defendant's liberty in any way. As the State notes, the officers had not yet activated their emergency lights and defendant had the opportunity to leave the scene if he did not wish to speak with them. Of course, when defendant afforded himself of that opportunity, Officer Szubski yelled out for him to stop and the officers gave chase, activating their lights and sirens well before defendant committed any moving violations or was seen disposing of suspected narcotics from the window of his vehicle. This was a show of authority. It is well established, however, that " '[a] person must *submit* to a show of authority before that show of authority can constitute a seizure.' " (Emphasis in original and emphasis omitted.) *Id.* at 112 (quoting *People v. Thomas*, 315 Ill. App. 3d 849, 857 (2000) (*Thomas I*)); see also *California v. Hodari D.*, 499 U.S. 621, 622-23, 629 (1991) (holding that, where defendant fled on foot from approaching officers in a high-crime area and, as he ran, discarded what was later determined to be a rock of crack cocaine, seizure had not yet occurred and reasonable suspicion was not required). We therefore examine the officers' basis for seizing defendant when they actually did so (*Thomas II*, 198 Ill. 2d at 113), *i.e.*, when defendant submitted to the officers' show of force and was taken into custody at the Third District police station. The testimony presented at trial overwhelmingly demonstrated that, by that point, defendant had committed numerous traffic violations that alone justified the officers detaining him.

¶ 54    Even had defendant submitted sooner, we find that his headlong flight from the officers " 'gave rise to an articulable suspicion that criminal activity was afoot.' " *Id.* at 114 (quoting *Thomas I*, 315 Ill. App. 3d at 858). In People v. Thomas, the arresting officer observed the

defendant—whom he had previously arrested for drug offenses and whom he had heard was delivering drugs in the area by bicycle—riding his bike at night and holding a police radio scanner. *Id.* at 106. Without instructing the defendant to stop or activating his emergency lights, the officer approached the defendant to conduct a field interview, at which point the defendant "abruptly turned into an alleyway and departed the area at an accelerated pace." *Id.* Another officer who witnessed the defendant's evasion activated his emergency lights and gave chase. Rather than stopping, the defendant abandoned his bicycle and continued to flee on foot. *Id.* at 107. Our supreme court concluded that, when the officer first approached, he in fact wanted to detain and interrogate the defendant and was prepared to do so "on a suspicion grounded in circumstances that fell short of warranting a stop." *Id.* at 110. Had the defendant submitted to the show of authority then and there, the stop would have been unjustified. *Id.* at 112. Instead, he engaged in "headlong flight," what the appellate court described as "a consummate act of evasion." *Thomas I*, 315 Ill. App. 3d at 858-59. Thus, by the time the officer succeeded in seizing the defendant, his "ungrounded suspicion had ripened into suspicion that fully warranted an investigatory stop." (Internal quotation marks omitted.) *Thomas II*, 198 Ill. 2d at 113.

¶ 55    Defendant acknowledges that unprovoked flight can be a basis for reasonable suspicion (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)), but contends that his flight in this case was provoked, characterizing it as "the response of a man who had not done anything wrong and feared engaging with police officers in an alley where he was alone and out of sight of any other person." We are not unsympathetic with this rationale. Here, however, defendant rapidly reversed out of the alley and engaged officers in a car chase during which he sped, drove the wrong way down one-way streets, disobeyed traffic signals, drove across an abandoned lot, and at one point onto a sidewalk. This was not a proportional reaction to any perceived threat

associated with two officers on foot approaching defendant seated in the driver seat of his vehicle. Certainly a person may refuse to cooperate with officers and go about one's business. See *People v. Kipfer*, 356 Ill. App. 3d 132, 139-40 (2005) (finding that defendant's mere act of ignoring and walking away from an officer attempting to question him did not rise to the level of unprovoked flight); *People v. Scott*, 277 Ill. App. 3d 579, 584-85 (1996) (holding that, without more, defendant's act of making a legal turn before reaching a roadside checkpoint did not support a reasonable suspicion of criminal activity). However, "[f]light, by its very nature, is not 'going about one's business'; in fact it is just the opposite." *Wardlaw*, 528 U.S. at 125. As in People v. Thomas, "[t]he defendant's reaction was in no way ambiguous. There was nothing to suggest that [he] was merely exercising the right to continue on his way or to cause confusion between the exercise of that right and a pure act of evasion." *Thomas I*, 315 Ill. App. 3d at 859; see also *Thomas II*, 198 Ill. 2d at 114 (citing with approval appellate court's analysis).

¶ 56    Because we find no seizure occurred until defendant was taken into custody, we need not consider whether either the fact that defendant's car was allegedly blocking the alley or the fact that it was missing a front license plate would have justified the officers detaining defendant at some earlier time. Where defendant engaged in headlong flight from officers attempting to question him, committed numerous traffic violations before being taken into custody, and was seen disposing of suspected controlled substances from the window of his vehicle, we conclude that the arresting officers had probable cause to arrest him. Accordingly, the circuit court did not err in denying defendant's motion to quash arrest and suppress evidence.

¶ 57                                B. *Voir Dire*

¶ 58    Defendant next contends the circuit court erred in refusing to allow his counsel to pose certain questions during *voir dire* designed to identify jurors who may have been biased against

him due to his race or involvement with controlled substances. Specifically, defendant argues the potential jurors should have been asked the following questions:

"(5) Do you have any close friends, family members, or colleagues who are African-American?

(7) Do you, or does anyone you know, have a problem with substance abuse or an addiction of any kind?

(8) What is your opinion about the use or sale of controlled substances?

(9) What is your closest relationship with a person of African-American descent?"[4]

¶ 59 Due process requires that, where a jury trial is provided, "the jury must stand impartial and indifferent." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). Illinois Supreme Court Rule 431(a) (eff. July 1, 2012) requires a circuit court to question potential jurors regarding their qualifications to serve in the case at trial. The court may permit the parties to submit additional questions to it for further inquiry if appropriate, and "shall permit the parties to supplement the examination by such direct inquiry as the court deems proper for a reasonable period of time depending upon the length of examination by the court, the complexity of the case, and the nature of the charges." *Id.* Within this framework, the manner and scope of *voir dire* employed in a given case is at the discretion of the

---

[4]    Although none is cited, the numbering, repeated here as it is found in defendant's brief, indicates that these questions may have been excerpted from a longer list.

circuit court. *Cloutier*, 156 Ill. 2d at 495. "[T]he test for evaluating the court's exercise of discretion is whether the means used to test impartiality have created a reasonable assurance that prejudice would be discovered if present." *People v. Peeples*, 155 Ill. 2d 422, 459 (1993).

¶ 60    The record in this case indicates that,[5] after questioning the potential jurors, the circuit court provided counsel for both sides the opportunity to ask their own questions. Defense counsel asked the first venire panel a handful of questions but declined to ask any of the second panel. Notably, she did not ask the four questions at issue here, nor any other questions designed to identify potential bias based on race or the use of controlled substances. Although defendant states in his brief that the questions were submitted to and rejected by the circuit court, the only indication of this in the record is a brief statement made by the circuit court when it denied defendant's motion for a new trial ("And I believe that the *voir dire* by the court was proper in this case, and I believe that the court's refusal to ask the questions requested by [defense counsel] was appropriate."). As the appellant, it is defendant's burden to present a sufficiently complete record of the trial proceedings to support a claim of error; in the absence of such a record, we must presume that the circuit court's ruling was properly supported by the evidence and in conformity with the law. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-93 (1984). We therefore conclude the circuit court did not err in refusing to ask potential jurors the proposed questions.

¶ 61    Even absent such a presumption, we are not persuaded that the circuit court was required to question the venire regarding race- or drug use-related bias. Defendant first argues that

---

[5]    Citing Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013), the State urges us to find that defendant has forfeited this issue by failing to identify where in the record his counsel submitted the proposed questions to the circuit court. Where the record is short and the issue is a simple one, however, we may choose to address the issue despite a party's failure to provide appropriate citations to the record. *People v. Johnson*, 192 Ill. 2d 202, 206 (2000). In any event, and as discussed below, we view this not as a failure to cite the record, but as a failure to provide a complete record in the first instance.

questions regarding racial prejudice should have been asked because defendant is African-American, the neighborhood in which he lives and in which the car chase took place is predominantly African-American, officers Petrulis and Shrake and their experts are white, and most of the potential jurors were not African-American, such that they were "not likely to be familiar with the area in which Mr. Abram live[d] or the way police interact with African-American men." Even assuming these facts to be true, we do not agree that, without more, they required the circuit court to question potential jurors regarding the nature and extent of their personal relationships with African-Americans.

¶ 62    It is well-established that " '[t]here is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups.' " *Peeples*, 155 Ill. 2d at 460 (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981)). A circuit court is therefore constitutionally required to question potential jurors specifically regarding racial prejudice only "if 'special circumstances' exist that suggest a constitutionally significant likelihood that racial prejudice might infect a defendant's trial," *i.e.*, where "racial issues are 'inextricably bound up with the conduct of the trial.' " *Id.* at 459-60 (quoting *Ristaino v. Ross*, 424 U.S. 589, 596-97 (1976)). The mere fact that the defendant is African-American and some of the officers are white does not give rise to the required "special circumstances." *Cf. People v. Diaz*, 123 Ill. App. 3d 239, 243 (1984) (where "[t]he only issue of race or ethnic origin was in the confrontation between white police officers and the defendant who [wa]s Mexican," the circuit court's refusal to specifically question the venire panel regarding potential racial bias did not give rise to a constitutional claim); *Peeples*, 155 Ill. 2d at 460 (noting that "[t]he sole fact that the defendant is black and the victim is white does not constitute a special circumstance of constitutional proportions") (internal quotation marks omitted (quoting *Turner v. Murray*, 476 U.S. 28, 33

(1986))). Here, the issue of race was "tangential to the proceedings" and there were "no racial overtones in the basic facts of the case," such that asking the jury questions designed to identify racial bias may well have improperly "inject[ed] considerations of race into a case where the issue was absent." *People v. Johnson*, 408 Ill. App. 3d 157, 167-69 (2010).

¶ 63    Defendant also argues that potential jurors should have been asked questions to discover bias against drug use or abuse where he was accused of possessing and selling drugs. The cases relied on by defendant, involving questions meant to elicit potential bias against members of street gangs or drunk drivers, are distinguishable. For example, in *People v. Strain*, 194 Ill. 2d 467, 477 (2000), our supreme court held that a defendant must be afforded an opportunity to question prospective jurors concerning gang bias in cases where gang membership and gang-related activity are an integral part of the trial. This court has held, however, that "the reasoning in *Strain* is limited to exposing possible gang bias," and has specifically declined to extend its holding to cases involving possible bias against drug dealers. *People v. Dixon*, 382 Ill. App. 3d 233, 245 (2008) (citing *People v. Morales*, 329 Ill. App. 3d 97, 113-14 (2002), *rev'd on other grounds*, 209 Ill. 2d 340 (2004)). We are not inclined to do otherwise now. Drug use itself, as opposed to the illegal act of possessing a controlled substance, was not an integral part of this case as gang membership was in *Strain*, where it was the motive for the crime and "gang information permeated the testimony of almost every witness at trial." *Strain*, 194 Ill. 2d at 473.

¶ 64    *People v. Lanter*, 230 Ill. App. 3d 72, 76 (1992), where the reviewing court held defense counsel was improperly precluded from discovering potential bias concerning drugs and alcohol, has likewise been confined to cases in which, unlike here, a defendant cites his own drug or alcohol abuse and addiction as an affirmative defense in the case. See *Dixon*, 382 Ill. App. 3d at 244. We similarly find *Village of Plainfield v. Nowicki*, 367 Ill. App. 3d 522 (2006)

distinguishable. The defendant in that case was arrested and charged with driving under the influence and improper lane usage. *Id.* at 523. The reviewing court held that "[w]hen intoxication is a *major issue* in a case, it is reversible error for the court not to question prospective jurors regarding their opinions toward alcohol." (Emphasis added.) *Id.* at 524. In this case, although defendant was charged with possession with intent to deliver, drug use itself was not a "major issue" at trial. It was never alleged, nor was any evidence presented, that defendant himself was a drug user or was under the influence of drugs at any time relevant to the events giving rise to his arrest.  Rather, the evidence concentrated on the car chase that occurred and defendant's alleged disposal of an illegal substance during that chase. Accordingly, we find the circumstances presented here distinguishable from those in *Nowicki.*

¶ 65     We are consequently not persuaded that the circuit court abused its discretion by denying defendant's request to probe potential jurors for race- or drug-related bias. The bare fact that defendant was an African-American charged with a drug-related offense was not enough to "effectively clos[e] the minds of jurors to the evidence such 'that they [could not] apply the law as instructed in accordance with their oath.' " (Internal quotation marks omitted.) *Dixon*, 382 Ill. App. 3d at 245 (quoting *Strain*, 194 Ill. 2d at 476). Absent any indication that "special circumstances" would cause race to infect the trial or that drug use would be a "major issue," the circuit court did not abuse its discretion in rejecting the proposed questions.

¶ 66                    C. Admissibility of OEM Audio Recording

¶ 67     Defendant further contends that the circuit court erred in permitting the introduction of hearsay statements made in the police "call out" tape from July 28, 2009, *i.e.*, the audio recording of officers pursuing defendant and recovering the narcotics allegedly ejected from the vehicle he was driving. " 'Hearsay' is a statement, other than one made by the declarant while testifying at

the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Hearsay is generally not admissible unless it falls within a recognized exception. *People v. Cloutier*, 178 Ill. 2d 141, 154 (1997). It is undisputed that the State sought to admit the recording at issue here for the truth of the statements contained in it. The only question on appeal, then, is whether the circuit court abused its discretion in ruling that the statements fall within recognized exceptions to the rule against hearsay. The State argues the recording was properly admitted under both the present sense impression and excited utterance exceptions.

¶ 68    The admission of evidence is within the sound discretion of the circuit court. We only reverse a circuit court's ruling regarding the admissibility of evidence where there is "a clear showing of abuse of that discretion." *People v. Ward*, 101 Ill. 2d 443, 455-56 (1984). "An abuse of discretion will be found only where the circuit court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the circuit court's view." *People v. Ursery*, 364 Ill. App. 3d 680, 686 (2006).

¶ 69    We first consider whether the statements made by the officers in the call-out tape were admissible as present sense impressions. Where the exception is recognized, a hearsay statement may nevertheless be admissible pursuant to the present sense impression exception if: (1) it describes or explains the event perceived; (2) the declarant perceived the event so described, and (3) the statement was substantially contemporaneous with the event in question. *Estate of Parks v. O'Young*, 289 Ill. App. 3d 976, 982 (1997). Although this is an established exception under the Federal Rules of Evidence, Illinois courts have traditionally not recognized it. *Id.* (citing Fed. R. Evid. 803(1)); see also *People v. Smith*, 127 Ill. App. 3d 622, 627 (1984) ("There is no exception to the hearsay rule which allows admission of a declaration of a witness to the event as to what

he saw happen." (Internal quotation marks omitted.)). Since 2011, furthermore, the Illinois Rules of Evidence have provided that hearsay is inadmissible except where specifically provided by rule or statute. Ill. R. Evid. 802 (eff. Jan. 1, 2011). Notably, no provision is made for a present sense impression exception. See Ill. R. Evid. 803(1) (eff. Jan. 1, 2011).

¶ 70    At the State's urging, the circuit court relied on *dicta* in *People v. Alsup*, 373 Ill. App. 3d 745 (2007), a Fifth District case in which recorded statements of officers broadcast on an emergency radio network during a car chase were admitted into evidence as business records. The court in *Alsup* concluded the recordings were alternatively admissible under the present sense impression and excited utterance exceptions. *Id.* at 758-59. It recited the elements of the former as they are set out in the Federal Rules of Evidence and relied on *People v. Stack*, 311 Ill. App. 3d 162 (1999) for the proposition that the exception is a recognized one. *Alsup*, 373 Ill. App. 3d at 757. In *Stack*, however, this court noted that "the present sense impression exception has *not* been adopted in Illinois" and determined that the defendant "ha[d] not presented a compelling argument for th[e] court to adopt [it] as a new exception to the rule of hearsay in Illinois." (Emphasis added.) *Stack*, 311 App. 3d at 176. Where the rules of evidence have since been codified, we do not find it appropriate to recognize a new hearsay exception, even were we inclined to do so. Because there is no recognized exception to the rule against hearsay in Illinois for present sense impressions, we hold the police call-out tape in this case was not properly admitted on this basis.

¶ 71    We next consider whether the statements qualified as excited utterances. A statement is admissible as an excited utterance where it "relat[es] to a startling event or condition" and is "made while the declarant was under the stress of excitement caused by the event or condition." Ill. R. Evid. 803(2) (eff. Jan. 1, 2011). The theory underlying the exception is that the event is so

startling that it "temporarily stills the capacity for reflection, thus producing statements free of conscious fabrication." *People v. Harris*, 134 Ill. App. 3d 705, 711 (1985). In determining whether a statement qualifies as an excited utterance, "courts consider the totality of the circumstances, including: the time elapsed between the event and the utterance, the nature of the event, the declarant's mental and physical condition, and the presence of self-interest." *People v. Dobbey*, 2011 IL App (1st) 091518 ¶ 44.

¶ 72 In the police recording at issue in this case, Officer Szubski is heard describing to police dispatch the speed and location of defendant's vehicle, as well as his observation of defendant's movements within the vehicle, to alert his fellow officers who were joining the chase. Officer Szubski eventually reports that defendant has been apprehended and other officers are heard describing their efforts to collect "proceeds" of the chase, *i.e.*, the controlled substances they contended were expelled from defendant's vehicle. There is no doubt that the statements made in the recording relate to the officers' efforts to apprehend defendant and were made contemporaneously with the events described. What we must consider on appeal is whether their pursuit of him was a sufficiently startling or exciting event and whether their statements were made while under the stress of excitement generated by that pursuit.

¶ 73 Defendant focuses on the fact that Officer Szubski is not a victim, but a trained law enforcement officer, urging us to conclude that his recorded radio communications are "essentially the same as a police report." The excited utterance exception, however, is not limited to statements made by victims. *People v. Sullivan*, 366 Ill. App. 3d 770, 781 (2006). Nor are we persuaded by defendant's argument that the exception should not apply where Officer Szubski may have been motivated to make untrue statements that he knew would help justify his decision to give chase or otherwise assist the State in its case against defendant. The exception *presumes*

the existence of a motive to fabricate in many declarants. It is the power of a sudden, startling event depriving the declarant of the opportunity to reflect, and thus to act on that motive, that makes a statement presumptively trustworthy. This is where we concentrate our analysis.

¶ 74    The State contends the events in question were sufficiently startling because "defendant was travelling at an extremely high rate of speed, driving the wrong way on multiple streets, fleeing from police officers with their emergency lights activated, and throwing objects out of the window, thereby endangering both officers and civilians." Defendant, on the other hand, argues there is no sense of urgency in the recording and that officers were simply following an unarmed individual whom no one had observed do anything illegal. Although the State describes the pursuit of defendant's vehicle as a high-speed chase, we note that Officer Szubski's voice is relatively calm throughout the recording, in contrast with cases where the declarant spoke in a frantic voice or appeared scared, hysterical, or upset. See *People v. Williams*, 193 Ill. 2d 306, 355 (2000). Indeed, Officer Szubski testified that on July 28, 2009 he was part of the Target Response Unit, was routinely sent to high crime areas in the city to interdict violent crimes involving gangs, guns, and drugs, and had made over 600 arrests. He also testified, however, that at the time of the pursuit, he and the other officers did not know for sure if another person was in the vehicle or if the driver was armed. In the recording, Officer Szubski stated twice  that he saw the defendant reaching under his seat, but on cross examination he admitted that the call he and his partner were responding to was for an individual with a rifle, a large weapon he agreed was "easily seen if someone [wa]s carrying it." Officer Szubski also testified that police procedures required him, before giving chase, to perform a balancing test, considering the need to apprehend the offender versus the safety of citizens at large. The Traffic Pursuit Report describing the incident furthermore indicated that traffic conditions were light that day and Officer Szubski's

vehicle reached a top speed of only 45 miles per hour.

¶ 75    Simply because a situation may cause some level of excitement does not mean that it rises to the level of a startling event capable of stilling the capacity for reflection. See, *e.g.*, *People v. Simon*, 2011 IL App (1st) 091197, ¶ 82 (encountering someone with a gun in his waistband was not a startling event); *People v. Evans*, 373 Ill. App. 3d 948, 965 (2007) (a fistfight between individuals engaged in earlier altercations was not "the sort of dramatic, startling event capable of generating an excited utterance"). Indeed, events that trigger the excited utterance exception are often several orders of magnitude higher in terms of their capacity to produce shock or alarm in a declarant than the events we are presented with here. See, *e.g.*, *Williams*, 193 Ill. 2d at 353 (witnessing the murder of one's sister and mother); *People v. Stiff*, 391 Ill. App. 3d 494, 502 (2009) (being doused with gasoline and set on fire); *People v. Gacho*, 122 Ill. 2d 221, 241 (1988) (suffering multiple gunshot wounds and being confined in a trunk with a dead body). Although the officers' pursuit of defendant in this case may not have had the same inherent capacity to startle as the events in other cases where Illinois courts have held the exception applied, we cannot say that the circuit court abused its discretion when it ruled that the circumstances present here were sufficiently startling to produce unreflective statements. This is particularly true where the circuit court, after observing Officer Szubski's live testimony concerning the car chase, had the opportunity to revisit its ruling when it denied defendant's motion for a judgment of acquittal or new trial. Having witnessed that live testimony, the circuit court was in a better position than this court to assess the likelihood that the officer was startled by the events in question. We therefore decline to disturb its ruling.

¶ 76    Moreover, even if the statements were not properly admitted as excited utterances, defendant suffered no undue prejudice from the playing of the police call-out tape, as no

information was provided in the recording that was not also established through the live testimony of Officer Szubski and the other officers. "Reversal for improperly admitted hearsay evidence is not warranted where properly admitted evidence proves the same matter." *People v. Songer*, 229 Ill. App. 3d 901, 906 (1992). Defense counsel herself admitted that the evidence was cumulative in her argument opposing the State's motion *in limine* ("there is no need for this other than to bolster the testimony of the officers because it doesn't provide anything that the officers themselves are not going to provide"). Nor are we persuaded that the background sounds of sirens would have unfairly confused or prejudiced the jury where the officers testified live and were available for cross examination to clear up any confusion.

¶ 77     Accordingly, we hold that the circuit court did not abuse its discretion by admitting the OEM recording pursuant to the excited utterance exception to the rule against hearsay. We furthermore conclude that, even if the exception did not apply, there was no resulting prejudice where the evidence provided in the recording was merely cumulative.

¶ 78                                    D. Chain of Custody

¶ 79     Defendant additionally argues that the State failed to take reasonable protective measures to ensure that the substances testing positive for cocaine in this case were the same substances either collected from defendant's vehicle or expelled from the vehicle as defendant fled from officers. In support of his argument, defendant identifies what he characterizes as "serious contradictions" in the testimony provided by the officers who collected the evidence. Specifically, defendant contends that officers Shrake and Petrulis provided differing accounts of the retrieval of a substance found near 517 East 62nd Street, as did officers Watkins and Normand with respect to the substance collected near 6400 South Martin Luther King Drive. The State contends that defendant forfeited this issue by failing to object at trial. It alternatively

argues that, on appeal, defendant misstates or ignores portions of the officers' testimony and raises issues that are irrelevant to a chain of custody challenge.

¶ 80    Where a defendant is charged with a narcotics violation, the physical evidence often does not have uniquely identifying characteristics, making it susceptible to tampering, contamination, or exchange. *People v. Woods*, 214 Ill. 2d 455, 466-67 (2005). In such cases, "[t]he State bears the burden to establish a custody chain that is sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution." *Id.* at 467. The State must show that "reasonable protective measures" were taken to ensure that the substance tested was the substance recovered from the defendant. *Id.* Once this *prima facie* case is established, "the burden then shifts to the defendant to produce evidence of actual tampering, alteration or substitution." *Id.* at 468. The State need not exclude every possibility of tampering or contamination; nor is every person in the chain required to testify. *Id.* at 467. " '[U]nless the defendant shows actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not admissibility, of the evidence.' " *Id.* at 468 (quoting *People v. Bynum*, 257 Ill. App. 3d 502, 510 (1994)).

¶ 81    We first consider the State's argument that this issue is forfeited. "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *Id.* at 470. A timely and specific objection to a lack of foundation is especially critical where it likely would have provided the State with a reasonable opportunity to correct the deficiency. *Bynum*, 257 Ill. App. 3d at 514-15. To establish that reasonable protective measures were taken, the State in this case presented the testimony of officers Shrake, Petrulis, Watkins, and Szubski, the individuals who retrieved and inventoried the narcotics evidence in question, as well as that of Ms. Frost, who took physical custody of the

samples for testing. The State claims defendant failed to raise a chain of custody objection to any of this evidence prior to his posttrial motion. This is incorrect. Defendant did seek to bar admission of People's Exhibit No. 2, the substance retrieved by Officer Watkins at approximately 6400 South Martin Luther King Drive, shortly after Officer Watkins testified. Defendant contended, as he does on appeal, that there was a break in the chain of custody where Officer Watkins could not specifically remember what she did with the substance when she returned to the squad car, other than that she kept it with her continuously before giving it to Officer Szubski at the Third District police station. We agree that defendant failed to preserve his objection to the chain of custody for the other samples by neglecting to raise those objections at trial.

¶ 82    With respect to People's Exhibit No. 2—and with respect to the other samples if defendant had preserved objections to them—we conclude that the State established a *prima facie* case that "reasonable protective measures" were taken to ensure that the substances tested were the same substance recovered from the defendant. The discrepancies in the officers' testimony that defendant relies on do not constitute evidence of actual tampering, alternation, or substitution but instead bear only on the weight of the evidence. See *People v. DeLuna*, 334 Ill. App. 3d 1, 22-24 (2002) (holding that minor discrepancies in officer's and forensic scientist's descriptions of confiscated narcotics, *e.g.*, whether a hole was poked in the evidence collection bag, went only to the weight of the evidence). The circuit court did not err in admitting the narcotics evidence in this case.

¶ 83    Furthermore, those discrepancies relate only to the substances collected at two of the three locations along the route of defendant's vehicle. Notably, defendant makes no argument that a proper chain of custody was not established for the bulk of the cocaine (People's Exhibit No. 16), which was retrieved from the driver seat upon his removal from the vehicle. According

to testimony presented by the State's forensic scientist, that sample alone weighed approximately 25 grams, an amount that, according to Officer Luce's testimony, represented approximately 250 hits or a street value of $2,500. Thus, even if defendant's chain of custody objections were made and sustained at trial, it would have done little to undermine the substantial evidence presented in support of the charges against him for possession with intent to deliver.

¶ 84                                    E. Reasonable Doubt

¶ 85    Defendant finally contends that the State failed to prove beyond a reasonable doubt that he was in actual possession of the cocaine retrieved by officers and admitted as evidence in this case. When reviewing the sufficiency of the evidence, we must determine whether, after viewing it in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). "It is the responsibility of the trier of fact to determine the credibility of witnesses, and to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *Williams*, 193 Ill. 2d at 338. We "will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Campbell*, 146 Ill. 2d at 375.

¶ 86    "In order to convict an individual of unlawful possession of a controlled substance, the State must prove that the defendant had knowledge of the presence of the controlled substance and that he or she also had immediate and exclusive possession or control of the narcotics." *Woods*, 214 Ill. 2d at 466. Possession may be actual or constructive. *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992). "Actual possession is proved by testimony which shows defendant exercised some form of dominion over the unlawful substance, such as trying to conceal it or throwing it away." *People v. Scott*, 152 Ill. App. 3d 868, 871 (1987).

¶ 87    In support of his argument that no rational trier of fact could have found him guilty beyond a reasonable doubt, defendant makes dubious inferences from the facts presented at trial; we find they do little to erode the strength of the State's case. For example, defendant admits the amount of cocaine found in the vehicle he was driving "was of a quantity that could be for distribution," but argues that his decision to drive into the parking lot of a police station does not support an inference that he possessed or intended to distribute cocaine. This ignores the testimony at trial establishing that, at the time, officers either had him completely surrounded or were rapidly closing in on him. In short, his was an act of surrender, not of innocent indifference. Defendant additionally notes that he did not own the vehicle he was driving and, at the time the drugs were removed from the driver seat of the vehicle, he was no longer in it, such that no officer ever saw the bag of drugs in his actual possession. "Proof that a defendant had control over the premises where the drugs were located," however, "gives rise to an inference of knowledge and possession of the drugs." *People v. Givens*, 237 Ill. 2d 311, 335 (2010). No one else was in the vehicle when defendant was arrested and defendant did not argue that the drugs in fact belonged to the vehicle's owner, Ms. Kimberly Pritchett, who lent him the vehicle.

¶ 88    With respect to the drugs collected along the vehicle's path, we must also reject defendant's argument that reasonable doubt exists where officers were not able to identify the items at the precise moment they were ejected from the moving vehicle. The officers consistently testified that they saw objects being thrown from the vehicle and that, in certain instances, they were able to keep those objects in view, go to where they were, and retrieve them for testing and identification. Defendant finally argues that the quantities of drugs found on the streets during the chase were only user quantities and were found lying unpackaged on the street in a "high narcotics trafficking" neighborhood. We find these facts inconsequential where defendant points

to no evidence from which a trier of fact could conclude that unclaimed narcotics were likely to be found lying about on the streets of that neighborhood. The officers testified at trial that they never lost sight of the objects from the time they were ejected from defendant's vehicle, it was light outside, there was no other debris in the street and no one else in the area.

¶ 89    Accordingly, we agree with the State that evidence of defendant's actual possession of narcotics in this case was substantial. The evidence clearly established that defendant was the driver of the vehicle, items were ejected from the vehicle as it eluded police officers, officers collected those substances without losing sight of them, an additional substance was in plain view on the seat of the vehicle when defendant was taken into custody, and all of the collected substances tested positive for cocaine. A rational jury could have found, based on this evidence, that defendant was guilty of possession with intent to deliver a controlled substance.

¶ 90                                  CONCLUSION

¶ 91    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 92    Affirmed.